Justice Thomas
delivered the opinion of the Court.
Title II of the Communications Act of 1934, 48 Stat. 1064, as amended, 47 U. S. C. § 151 et seq., subjects all providers of “telecommunications servicie]” to mandatory common-carrier regulation, § 153(44). In the order under review, the *974 Federal Communications Commission concluded that cable companies that sell broadband Internet service do not provide “telecommunications servic[ej” as the Communications Act defines that term, and hence are exempt from mandatory common-carrier regulation under Title II. We must decide whether that conclusion is a lawful construction of the Communications Act under Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc., 467 U. S. 837 (1984), and the Administrative Procedure Act, 5 U. S. C. § 551 et seq. We hold that it is.
I
The traditional means by which consumers in the United States access the network of interconnected computers that make up the Internet is through “dial-up” connections provided over local telephone facilities. See 345 F. 3d 1120, 1123-1124 (CA9 2003) (cases below); In re Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities, 17 FCC Red. 4798, 4802-4803, ¶ 9 (2002) (hereinafter Declaratory Ruling). Using these connections, consumers access the Internet by making calls with computer modems through the telephone wires owned by local phone companies. See Verizon Communications Inc. v. FCC, 535 U. S. 467, 489-490 (2002) (describing the physical structure of a local telephone exchange). Internet service providers (ISPs), in turn, link those calls to the Internet network, not only by providing a physical connection, but also by offering consumers the ability to translate raw Internet data into information they may both view on their personal computers and transmit to other computers connected to the Internet. See In re Federal-State Joint Board on Universal Service, 13 FCC Red. 11501, 11531, ¶63 (1998) (hereinafter Universal Service Report or Report); P. Huber, M. Kellogg, & J. Thorne, Federal Telecommunications Law 988 (2d ed. 1999) (hereinafter Huber); 345 F. 3d, at 1123-1124. Technological limitations of local telephone wires, however, retard the speed at which data from the Internet may be transmitted *975 through end users’ dial-up connections. Dial-up connections are therefore known as “narrowband,” or slower speed, connections.
“Broadband” Internet service, by contrast, transmits data at much higher speeds. There are two principal kinds of broadband Internet service: cable modem service and Digital Subscriber Line (DSL) service. Cable modem service transmits data between the Internet and users’ computers via the network of television cable lines owned by cable companies. See id., at 1124. DSL service provides high-speed access using the local telephone wires owned by local telephone companies. See WorldCom, Inc. v. FCC, 246 F. 3d 690, 692 (CADC 2001) (describing DSL technology). Cable companies and telephone companies can either provide Internet access directly to consumers, thus acting as ISPs themselves, or can lease their transmission facilities to independent ISPs that then use the facilities to provide consumers with Internet access. Other ways of transmitting high-speed Internet data into homes, including terrestrial- and satellite-based wireless networks, are also emerging. Declaratory Ruling 4802, ¶ 6.
II
At issue in these cases is the proper regulatory classification under the Communications Act of broadband cable Internet service. The Act, as amended by the Telecommunications Act of 1996, 110 Stat. 56, defines two categories of regulated entities relevant to these cases: telecommunications carriers and information-service providers. The Act regulates telecommunications carriers, but not information-service providers, as common carriers. Telecommunications carriers, for example, must charge just and reasonable, nondiscriminatory rates to their customers, 47 U. S. C. §§201-209, design their systems so that other carriers can interconnect with their communications networks, § 251(a)(1), and contribute to the federal “universal service” fund, § 254(d). *976 These provisions are mandatory, but the Commission must forbear from applying them if it determines that the public interest requires it. §§ 160(a), (b). Information-service providers, by contrast, are not subject to mandatory common-carrier regulation under Title II, though the Commission has jurisdiction to impose additional regulatory obligations under its Title I ancillary jurisdiction to regulate interstate and foreign communications, see §§ 151-161.
These two statutory classifications originated in the late 1970’s, as the Commission developed rules to regulate data-processing services offered over telephone wires. That regime, the “Computer II” rules, distinguished between “basic” service (like telephone service) and “enhanced” service (computer-processing service offered over telephone lines). In re Amendment of Section 64-702 of the Commission’s Rules and Regulations (Second Computer Inquiry), 77 F.C.C. 2d 384, 417-423, ¶¶86-101 (1980) (hereinafter. Computer II Order). The Computer II rules defined both basic and enhanced services by reference to how the consumer perceives the service being offered.
In particular, the Commission defined “basic service” as “a pure transmission capability over a communications path that is virtually transparent in terms of its interaction with customer supplied information.” Id., at 420, ¶96. By “pure” or “transparent” transmission, the Commission meant a communications path that enabled the consumer to transmit an ordinary-language message to another point, with no computer processing or storage of the information, other than the processing or storage needed to convert the message into electronic form and then back into ordinary language for purposes of transmitting it over the network— such as via a telephone or a facsimile. Id., at 419-420, ¶¶ 94-95. Basic service was subject to common-carrier regulation. Id., at 428, ¶ 114.
“[Ejnhanced service,” however, was service in which “computer processing applications [were] used to act on the *977 content, code, protocol, and other aspects of the subscriber’s information,” such as voice and data storage services, id., at 420-421, ¶ 97, as well as “protocol conversion” (i. e., ability to communicate between networks that employ different data-transmission formats), id., at 421-422, ¶99. By contrast to basic service, the Commission decided not to subject providers of enhanced service, even enhanced service offered via transmission wires, to Title II common-carrier regulation. Id., at 428-432, ¶¶ 115-123. The Commission explained that it was unwise to subject enhanced service to common-carrier regulation given the “fast-moving, competitive market” in which they were offered. Id., at 434, ¶ 129.
The definitions of the terms “telecommunications service” and “information service” established by the 1996 Act are similar to the Computer II basic- and enhanced-service classifications. “Telecommunications service” — the analog to basic service — is “the offering of telecommunications for a fee directly to the public... regardless of the facilities used.” 47 U. S. C. § 153(46). “Telecommunications” is “the transmission, between or among points specified by the user, of information of the user’s choosing, without change in the form or content of the information as sent and received.” § 153(43). “Telecommunications carrier[s]” — those subjected to mandatory Title II common-carrier regulation — are defined as “provider^] of telecommunications services.” §153(44). And “information service” — the analog to enhanced service — is “the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications . .. .” § 153(20).
In September 2000, the Commission initiated a rulemaking proceeding to, among other things, apply these classifications to cable companies that offer broadband Internet service directly to consumers. In March 2002, that rulemaking culminated in the Declaratory Ruling under review in these cases. In the Declaratory Ruling, the Commission con- *978 eluded that broadband Internet service provided by cable companies is an “information service” but not a “telecommunications service” under the Act, and therefore not subject to mandatory Title II common-carrier regulation. In support of this conclusion, the Commission relied heavily on its Universal Service Report See Declaratory Ruling 4821-4822, ¶¶ 36-37 (citing Universal Service Report). The Universal Service Report classified “non-facilities-based” ISPs— those that do not own the transmission facilities they use to connect the end user to the Internet — solely as information-service providers. See Universal Service Report 11533, ¶67. Unlike those ISPs, cable companies own the cable lines they use to provide Internet access. Nevertheless, in the Declaratory Ruling, the Commission found no basis in the statutory definitions for treating cable companies differently from non-facilities-based ISPs: Both offer “a single, integrated service that enables the subscriber to utilize Internet access service . . . and to realize the benefits of a comprehensive service offering.” Declaratory Ruling 4823, ¶38. Because Internet access provides a capability for manipulating and storing information, the Commission concluded that it was an information service. Ibid.
The integrated nature of Internet access and the high-speed wire used to provide Internet access led the Commission to conclude that cable companies providing Internet access are not telecommunications providers. This conclusion, the Commission reasoned, followed from the logic of the Universal .Service Report. The Report had concluded that, though Internet service “involves data transport elements” because “an Internet access provider must enable the movement of information between customers’ own computers and distant computers with which those customers seek to interact,” it also “offers end users information-service capabilities inextricably intertwined with data transport.” Universal Service Report 11539-11540, ¶ 80. ISPs, therefore, were not “offering ... telecommunications ... directly to the public,” *979 § 153(46), and so were not properly classified as telecommunications carriers, see id., at 11540, ¶ 81. In other words, the Commission reasoned that consumers use their cable modems not to transmit information “transparently,” such as by using a telephone, but instead to obtain Internet access.
The Commission applied this same reasoning to cable companies offering broadband Internet access. Its logic was that, like non-facilities-based ISPs, cable companies do not “offe[r] telecommunications service to the end user, but rather . . . merely us[e] telecommunications to provide end users with cable modem service.” Declaratory Ruling 4824, ¶ 41. Though the Commission declined to apply mandatory Title II common-carrier regulation to cable companies, it invited comment on whether under its Title I jurisdiction it should require cable companies to offer other ISPs access to their facilities on common-carrier terms. Id., at 4839, ¶ 72. Numerous parties petitioned for judicial review, challenging the Commission’s conclusion that cable modem service was not telecommunications service. By judicial lottery, the Court of Appeals for the Ninth Circuit was selected as the venue for the challenge.
The Court of Appeals granted the petitions in part, vacated the Declaratory Ruling in part, and remanded to the Commission for further proceedings. In particular, the Court of Appeals vacated the ruling to the extent it concluded that cable modem service was not “telecommunications service” under the Communications Act. It held that the Commission could not permissibly construe the Communications Act to exempt cable companies providing Internet service from Title II regulation. See 345 F. 3d, at 1132. Rather than analyzing the permissibility of that construction under the deferential framework of Chevron, 467 U. S. 837, however, the Court of Appeals grounded its holding in the stare decisis effect of AT&T Corp. v. Portland, 216 F. 3d 871 (CA9 2000). See 345 F. 3d, at 1128-1132. Portland held that cable modem service was a “telecommunications serv *980 ice,” though the court in that case was not reviewing an administrative proceeding and the Commission was not a party to the case. See 216 F. 3d, at 877-880. Nevertheless, Portland’s holding, the Court of Appeals reasoned, overrode the contrary interpretation reached by the Commission in the Declaratory Ruling. See 345 F. 3d, at 1130-1131.
We granted certiorari to settle the important questions of federal law that these cases present. 543 U. S. 1018 (2004).
Ill
We first consider whether we should apply Chevron’s framework to the Commission’s interpretation of the term “telecommunications service.” We conclude that we should. We also conclude that the Court of Appeals should have done the same, instead of following the contrary construction it adopted in Portland.
A
In Chevron, this Court held that ambiguities in statutes within an agency’s jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion. Filling these gaps, the Court explained, involves difficult policy choices that agencies are better equipped to make than courts. 467 U. S., at 865-866. If a statute is ambiguous, and if the implementing agency’s construction is reasonable, Chevron requires a federal court to accept the agency’s construction of the statute, even if the agency’s reading differs from what the court believes is the best statutory interpretation. Id., at 843-844, and n. 11.
The Chevron framework governs our review of the Commission’s construction. Congress has delegated to the Commission the authority to “execute and enforce” the Communications Act, §151, and to “prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions” of the Act, § 201(b); AT&T Corp. v. Iowa Utilities Bd., 525 U. S. 366, 377-378 (1999). These provisions give the Commission the authority to promulgate *981 binding legal rules; the Commission issued the order under review in the exercise of that authority; and no one questions that the order is within the Commission’s jurisdiction. See Household Credit Services, Inc. v. Pfennig, 541 U. S. 232, 238-239 (2004); United States v. Mead Corp., 533 U. S. 218, 231-234 (2001); Christensen v. Harris County, 529 U. S. 576, 586-588 (2000). Hence, as we have in the past, we apply the Chevron framework to the Commission’s interpretation of the Communications Act. See National Cable & Telecommunications Assn., Inc. v. Gulf Power Co., 534 U. S. 327, 333-339 (2002); Verizon, 535 U. S., at 501-502.
Some of the respondents dispute this conclusion, on the ground that the Commission’s interpretation is inconsistent with its past practice. We reject this argument. Agency inconsistency is not a basis for declining to analyze the agency’s interpretation under the Chevron framework. Unexplained inconsistency is, at most, a reason for holding an interpretation to be an arbitrary and capricious change from agency practice under the Administrative Procedure Act. See Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co., 463 U. S. 29, 46-57 (1983). For if the agency adequately explains the reasons for a reversal of policy, “change is not invalidating, since the whole point of Chevron is to leave the discretion provided by the ambiguities of a statute with the implementing agency.” Smiley v. Citibank (South Dakota), N. A., 517 U. S. 735, 742 (1996); see also Rust v. Sullivan, 500 U. S. 173, 186-187 (1991); Barnhart v. Walton, 535 U. S. 212, 226 (2002) (Scalia, J., concurring in part and concurring in judgment). “An initial agency interpretation is not instantly carved in stone. On the contrary, the agency ... must consider varying interpretations and the wisdom of its policy on a continuing basis,” Chevron, supra, at 863-864, for example, in response to changed factual circumstances, or a change in administrations, see State Farm, supra, at 59 (Rehnquist, J., concurring in part and dissenting in part). That is no doubt why *982 in Chevron itself, this Court deferred to an agency interpretation that was a recent reversal of agency policy. See 467 U. S., at 857-858. We therefore have no difficulty concluding that Chevron applies.
B
The Court of Appeals declined to apply Chevron because it thought the Commission’s interpretation of the Communications Act foreclosed by the conflicting construction of the Act it had adopted in Portland. See 345 F. 3d, at 1127-1132. It based that holding on the assumption that Portland’s construction overrode the Commission’s, regardless of whether Portland had held the statute to be unambiguous. 345 F. 3d, at 1131. That reasoning was incorrect.
A court’s prior judicial construction of a statute trumps an agency construction otherwise entitled to Chevron deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion. This principle follows from Chevron itself. Chevron established a “presumption that Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows.” Smiley, supra, at 740-741. Yet allowing a judicial precedent to foreclose an agency from interpreting an ambiguous statute, as the Court of Appeals assumed it could, would allow a court’s interpretation to override an agency’s. Chevron’s premise is that it is for agencies, not courts, to fill statutory gaps. See 467 U. S., at 843-844, and n. 11. The better rule is to hold judicial interpretations contained in precedents to the same demanding Chevron step one standard that applies if the court is reviewing the agency’s construction on a blank slate: Only a judicial precedent holding that the statute *983 unambiguously forecloses the agency’s interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction.
A contrary rule would produce anomalous results. It would mean that whether an agency’s interpretation of an ambiguous statute is entitled to Chevron deference would turn on the order in which the interpretations issue: If the court’s construction came first, its construction would prevail, whereas if the agency’s came first, the agency’s construction would command Chevron deference. Yet whether Congress has delegated to an agency the authority to interpret a statute does not depend on the order in which the judicial and administrative constructions occur. The Court of Appeals’ rule, moreover, would “lead to the ossification of large portions of our statutory law,” Mead, 533 U. S., at 247 (Scalia, J., dissenting), by precluding agencies from revising unwise judicial constructions of ambiguous statutes. Neither Chevron nor the doctrine of stare decisis requires these haphazard results.
The dissent answers that allowing an agency to override what a court believes to be the best interpretation of a statute makes “judicial decisions subject to reversal by executive officers.” Post, at 1016 (opinion of Scalia, J.). It does not. Since Chevron teaches that a court’s opinion as to the best reading of an ambiguous statute an agency is charged with administering is not authoritative, the agency’s decision to construe that statute differently from a court does not say that the court’s holding was legally wrong. Instead, the agency may, consistent with the court’s holding, choose a different construction, since the agency remains the authoritative interpreter (within the limits of reason) of such statutes. In all other respects, the court’s prior ruling remains binding law (for example, as to agency interpretations to which Chevron is inapplicable). The precedent has not been “reversed” by the agency, any more than a federal court’s interpretation of a State’s law can be said to have been “reversed” by a *984 state court that adopts a conflicting (yet authoritative) interpretation of state law.
The Court of Appeals derived a contrary rule from a mistaken reading of this Court’s decisions. It read Neal v. United States, 516 U. S. 284 (1996), to establish that a prior judicial construction of a statute categorically controls an agency’s contrary construction. 345 F. 3d, at 1131-1132; see also post, at 1016, n. 11 (Scalia, J., dissenting). Neal established no such proposition. Neal declined to defer to a construction adopted by the United States Sentencing Commission that conflicted with one the Court previously had adopted in Chapman v. United States, 500 U. S. 453 (1991). Neal, supra, at 290-295. Chapman, however, had held the relevant statute to be unambiguous. See 500 U. S., at 463 (declining to apply the rule of lenity given the statute’s clear language). Thus, Neal established only that a precedent holding a statute to be unambiguous forecloses a contrary agency construction. That limited holding accorded with this Court’s prior decisions, which had held that a court’s interpretation of a statute trumps an agency’s under the doctrine of stare decisis only if the prior court holding “determined a statute’s clear meaning.” Maislin Industries, U S., Inc. v. Primary Steel, Inc., 497 U. S. 116, 131 (1990) (emphasis added); see also Lechmere, Inc. v. NLRB, 502 U. S. 527, 536-537 (1992). Those decisions allow a court’s prior interpretation of a statute to override an agency’s interpretation only if the relevant court decision held the statute unambiguous.
Against this background, the Court of Appeals erred in refusing to apply Chevron to the Commission’s interpretation of the definition of “telecommunications service,” 47 U. S. C. § 153(46). Its prior decision in Portland held only that the best reading of § 153(46) was that cable modem service was a “telecommunications service,” not that it was the only permissible reading of the statute. See 216 F. 3d, at 877-880. Nothing in Portland held that the Communica *985 tions Act unambiguously required treating cable Internet providers as telecommunications carriers. Instead, the court noted that it was “not presented with a case involving potential deference to an administrative agency’s statutory construction pursuant to the Chevron doctrine,” id., at 876; and the court invoked no other rule of construction (such as the rule of lenity) requiring it to conclude that the statute was unambiguous to reach its judgment. Before a judicial construction of a statute, whether contained in a precedent or not, may trump an agency’s, the court must hold that the statute unambiguously requires the court’s construction. Portland did not do so.
As the dissent points out, it is not logically necessary for us to reach the question whether the Court of Appeals misapplied Chevron for us to decide whether the Commission acted lawfully. See post, at 1019-1020 (opinion of Scalia, J.). Nevertheless, it is no “great mystery” why we are reaching the point here. Post, at 1019. There is genuine confusion in the lower courts over the interaction between the Chevron doctrine and stare decisis principles, as the petitioners informed us at the certiorari stage of this litigation. See Pet. for Cert, of Federal Communications Commission et al. in No. 04-281, pp. 19-23; Pet. for Cert. of National Cable & Telecomm. Assn, et al. in No. 04-277, pp. 22-29. The point has been briefed. See Brief for Federal Petitioners 38-44; Brief for Cable-Industry Petitioners 30-36. And not reaching the point could undermine the purpose of our grant of certiorari: to settle authoritatively whether the Commission’s Declaratory Ruling is lawful. Were we to uphold the Declaratory Ruling without reaching the Chevron point, the Court of Appeals could once again strike down the Commission’s rule based on its Portland decision. Portland (at least arguably) could compel the Court of Appeals once again to reverse the Commission despite our decision, since our conclusion that it is reasonable to read the Communications Act to classify cable modem service solely as an “infor *986 mation service” leaves untouched Portland's holding that the Commission’s interpretation is not the best reading of the statute. We have before decided similar questions that were not, strictly speaking, necessary to our disposition. See, e. g., Agostini v. Felton, 521 U. S. 203, 237 (1997) (requiring the Courts of Appeals to adhere to our directly controlling precedents, even those that rest on reasons rejected in other decisions); Roper v. Simmons, 543 U. S. 551, 628-629 (2005) (Scalia, J., dissenting) (criticizing this Court for not reaching the question whether the Missouri Supreme Court erred by failing to follow directly controlling Supreme Court precedent, though that conclusion was not necessary to the Court’s decision). It is prudent for us to do so once again today.
IV
We next address whether the Commission’s construction of the definition of “telecommunications service,” 47 U. S. C. §153(46), is a permissible reading of the Communications Act under the Chevron framework. Chevron established a familiar two-step procedure for evaluating whether an agency’s interpretation of a statute is lawful. At the first step, we ask whether the statute’s plain terms “directly ad-dres[s] the precise question at issue.” 467 U. S., at 843. If the statute is ambiguous on the point, we defer at step two to the agency’s interpretation so long as the construction is “a reasonable policy choice for the agency to make.” Id., at 845. The Commission’s interpretation is permissible at both steps.
A
We first set forth our understanding of the interpretation of the Communications Act that the Commission embraced. The issue before the Commission was whether cable companies providing cable modem service are providing a “telecommunications service” in addition to an “information service.”
*987 The Commission first concluded that cable modem service is an “information service,” a conclusion unchallenged here. The Act defines “information service” as “the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications____” § 158(20). Cable modem service is an information service, the Commission reasoned, because it provides consumers with a comprehensive capability for manipulating information using the Internet via high-speed telecommunications. That service enables users, for example, to browse the World Wide Web, to transfer files from file archives available on the Internet via the “File Transfer Protocol,” and to access e-mail and Usenet newsgroups. Declaratory Ruling 4821, ¶ 37; Universal Service Report 11537, ¶ 76. Like other forms of Internet service, cable modem service also gives users access to the Domain Name System (DNS). DNS, among other things, matches the Web page addresses that end users type into their browsers (or “click” on) with the Internet Protocol (IP) addresses[1] of the servers containing the Web pages the users wish to aecess. Declaratory Ruling 4821-4822, ¶ 37. All of these features, the Commission concluded, were part of the information service that cable companies provide consumers. Id., at 4821-4823, ¶¶ 36-38; see also Universal Service Report 11536-11539, ¶¶ 75-79.
At the same time, the Commission concluded that cable modem service was not “telecommunications service.” “Telecommunications service” is “the offering of telecommunications for a fee directly to the public.” 47 U. S. C. § 153(46). “Telecommunications,” in turn, is defined as “the transmission, between or among points specified by the user, of information of the user’s choosing, without change in the form or content of the information as sent and received.” *988 § 153(48). The Commission conceded that, like all information-service providers, cable companies use “telecommunications” to provide consumers with Internet service; cable companies provide such service via the high-speed wire that transmits signals to and from an end user’s computer. Declaratory Ruling 4823, ¶ 40. For the Commission, however, the question whether cable broadband Internet providers “offer” telecommunications involved more than whether telecommunications was one necessary component of cable modem service. Instead, whether that service also includes a telecommunications “offering” “turn[ed] on the nature of the functions the end user is offered,” id., at 4822, ¶ 38 (emphasis added), for the statutory definition of “telecommunications service” does not “res[t] on the particular types of facilities used,” id., at 4821, ¶ 35; see § 153(46) (definition of “telecommunications service” applies “regardless of the facilities used”).
Seen from the consumer’s point of view, the Commission concluded, cable modem service is not a telecommunications offering because the consumer uses the high-speed wire always in connection with the information-processing capabilities provided by Internet access, and because the transmission is a necessary component of Internet access: “As provided to the end user the telecommunications is part and parcel of cable modem service and is integral to its other capabilities.” Declaratory Ruling 4823, ¶ 39. The wire is used, in other words, to access the World Wide Web, newsgroups, and so forth, rather than “transparently” to transmit and receive ordinary-language messages without computer processing or storage of the message. See supra, at 976 (noting the Computer II notion of “transparent” transmission). The integrated character of this offering led the Commission to conclude that cable modem service is not a “stand-alone,” transparent offering of telecommunications. Declaratory Ruling 4823-4825, ¶¶ 41-43.
*989 B
This construction passes Chevron's first step. Respondents argue that it does not, on the ground that cable companies providing Internet service necessarily “offe[r]” the underlying telecommunications used to transmit that service. The word “offering” as used in § 153(46), however, does not unambiguously require that result. Instead, “offering” can reasonably be read to mean a “stand-alone” offering of telecommunications, i. e., an offered service that, from the user’s perspective, transmits messages unadulterated by computer processing. That conclusion follows not only from the ordinary meaning of the word “offering,” but also from the regulatory history of the Communications Act.
1
Cable companies in the broadband Internet service business “offe[r]” consumers an information service in the form of Internet access and they do so “via telecommunications,” § 153(20), but it does not inexorably follow as a matter of ordinary language that they also “offe[r]” consumers the high-speed data transmission (telecommunications) that is an input used to provide this service, § 153(46). We have held that where a statute’s plain terms admit of two or more reasonable ordinary usages, the Commission’s choice of one of them is entitled to deference. See Verizon, 535 U. S., at 498 (deferring to the Commission’s interpretation of the term “cost” by reference to an alternative linguistic usage defined by what “[a] merchant who is asked about ‘the cost of providing the goods’ ” might “reasonably” say); National Railroad Passenger Corporation v. Boston & Maine Corp., 503 U. S. 407, 418 (1992) (agency construction entitled to deference where there were “alternative dictionary definitions of the word” at issue). The term “offe[r]” as used in the definition of telecommunications service, §153(46), is ambiguous in this way.
*990 It is common usage to describe what a company “offers” to a consumer as what the consumer perceives to be the integrated finished product, even to the exclusion of discrete components that compose the product, as the dissent concedes. See post, at 1006-1007 (opinion of Scalia, J.). One might well say that a car dealership “offers” cars, but does not “offer” the integrated major inputs that make purchasing the ear valuable, such as the engine or the chassis. It would, in fact, be odd to describe a car dealership as “offering” consumers the car’s components in addition to the car itself. Even if it is linguistically permissible to say that the car dealership “offers” engines when it offers cars, that shows, at most, that the term “offer,” when applied to a commercial transaction, is ambiguous about whether it describes only the offered finished product, or the product’s discrete components as well. It does not show that no other usage is permitted.
The question, then, is whether the transmission component of cable modem service is sufficiently integrated with the finished service to make it reasonable to describe the two as a single, integrated offering. See ibid. We think that they are sufficiently integrated, because “[a] consumer uses the high-speed wire always in connection with the information-processing capabilities provided by Internet access, and because the transmission is a necessary component of Internet access.” Supra, at 988. In the telecommunications context, it is at least reasonable to describe companies as not “offering” to consumers each discrete input that is necessary to providing, and is always used in connection with, a finished service. We think it no misuse of language, for example, to say that cable companies providing Internet service do not “offer” consumers DNS, even though DNS is essential to providing Internet access. Declaratory Ruling 4810, n. 74, 4822-4823, ¶38. Likewise, a telephone company “offers” consumers a transparent transmission path that conveys an ordinary-language message, not necessarily the data- *991 transmission facilities that also “transmit] . . . information of the user’s choosing,” § 153(43), or other physical elements of the facilities used to provide telephone service, like the trunks and switches, or the copper in the wires. What cable companies providing cable modem service and telephone companies providing telephone service “offer” is Internet service and telephone service respectively — the finished services, though they do so using (or “via”) the discrete components composing the end product, including data transmission. Such functionally integrated components need not be described as distinct “offerings.”
In response, the dissent argues that the high-speed transmission component necessary to providing cable modem service is necessarily “offered” with Internet service because cable modem service is like the offering of pizza delivery service together with pizza, and the offering of puppies together with dog leashes. Post, at 1007-1008 (opinion of Scalia, J.). The dissent’s appeal to these analogies only underscores that the term “offer” is ambiguous in the way that we have described. The entire question is whether the products here are functionally integrated (like the components of a car) or functionally separate (like pets and leashes). That question turns not on the language of the Act, but on the factual particulars of how Internet technology works and how it is provided, questions Chevron leaves to the Commission to resolve in the first instance. As the Commission has candidly recognized, “the question may not always be straightforward whether, on the one hand, an entity is providing a single information service with communications and computing components, or, on the other hand, is providing two distinct services, one of which is a telecommunications service.” Universal Service Report 11530, ¶60. Because the term “offer” can sometimes refer to a single, finished product and sometimes to the “individual components in a package being offered” (depending on whether the components “still possess sufficient identity to be described *992 as separate objects,” post, at 1006), the statute fails unambiguously to classify the telecommunications component of cable modem service as a distinct offering. This leaves federal telecommunications policy in this technical and complex area to be set by the Commission, not by warring analogies.
We also do not share the dissent’s certainty that cable modem service is so obviously like pizza delivery service and the combination of dog leashes and dogs that the Commission could not reasonably have thought otherwise. Post, at 1007-1008. For example, unlike the transmission component of Internet service, delivery service and dog leashes are not integral components of the finished products (pizzas and pet dogs). One can pick up a pizza rather than having it delivered, and one can own a dog without buying a leash. By contrast, the Commission reasonably concluded, a consumer cannot purchase Internet service without also purchasing a connection to the Internet and the transmission always occurs in connection with information processing. In any event, we doubt that a statute that, for example, subjected offerors of “delivery” service (such as Federal Express and United Parcel Service) to common-carrier regulation would unambiguously require pizza-delivery companies to offer their delivery services on a common-carrier basis.
2
The Commission’s traditional distinction between basic and enhanced service, see supra, at 976-977, also supports the conclusion that the Communications Act is ambiguous about whether cable companies “offer” telecommunications with cable modem service. Congress passed the definitions in the Communications Act against the background of this regulatory history, and we may assume that the parallel terms “telecommunications service” and “information service” substantially incorporated their meaning, as the Commission has held. See, e. g., In re Federal-State Joint Board on Universal Service, 12 FCC Red. 8776, 9179-9180, ¶788 *993 (1997) (noting that the “definition of enhanced services is substantially similar to the definition of information services” and that “all services previously considered 'enhanced services’ are ‘information services’ ”); Commissioner v. Keystone Consol. Industries, Inc., 508 U. S. 152, 159 (1993) (noting presumption that Congress is aware of “settled judicial and administrative interpretation^]” of terms when it enacts a statute). The regulatory history in at least two respects confirms that the term “telecommunications service” is ambiguous.
First, in the Computer II Order that established the terms “basic” and “enhanced” services, the Commission defined those terms functionally, based on how the consumer interacts with the provided information, just as the Commission did in the order below. See supra, at 976-977. As we have explained, Internet service is not “transparent in terms of its interaction with customer supplied information,” Computer II Order 420, ¶ 96; the transmission occurs in connection with information processing. It was therefore consistent with the statute’s terms for the Commission to assume that the parallel term “telecommunications service” in 47 U. S. C. § 153(46) likewise describes a “pure” or “transparent” communications path not necessarily separately present, from the end user’s perspective, in an integrated information-service offering.
The Commission’s application of the basic/enhanced-service distinction to non-facilities-based ISPs also supports this conclusion. The Commission has long held that “all those who provide some form of transmission services are not necessarily common carriers.” Computer II Order 431, ¶ 122; see also id., at 435, ¶ 132 (“acknowledg[ing] the existence of a communications component” in enhanced-service offerings). For example, the Commission did not subject to common-carrier regulation those service providers that offered enhanced services over telecommunications facilities, but that did not themselves own the underlying facilities— so-called “non-facilities-based” providers. See Universal *994 Service Report 11530, ¶ 60. Examples of these services included database services in which a customer used telecommunications to access information, such as Dow Jones News and Lexis, as well as “value added networks,” which lease wires from common carriers and provide transmission as well as protocol-processing service over those wires. See In re Amendment to Sections 6U.702 of the Commission's Rules and Regulations (Third Computer Inquiry), 3 FCC Red. 1150, 1153, n. 23 (1988); supra, at 977 (explaining protocol conversion). These services “combined] communications and computing components,” yet the Commission held that they should “always be deemed enhanced” and therefore not subject to common-carrier regulation. Universal Service Report 11530, ¶60. Following this traditional distinction, the Commission in the Universal Service Report classified ISPs that leased rather than owned their transmission facilities as pure information-service providers. Id., at 11540, ¶ 81.
Respondents’ statutory arguments conflict with this regulatory history. They claim that the Communications Act unambiguously classifies as telecommunications carriers all entities that use telecommunications inputs to provide information service. As respondent MCI concedes, this argument would subject to mandatory common-carrier regulation all information-service providers that use telecommunications as an input to provide information service to the public. Brief for Respondent MCI, Inc., 30. For example, it would subject to common-carrier regulation non-facilities-based ISPs that own no transmission facilities. See Universal Service Report 11532-11533, ¶ 66. Those ISPs provide consumers with transmission facilities used to connect to the Internet, see supra, at 974, and so, under respondents’ argument, necessarily “offer” telecommunications to consumers. Respondents’ position that all such entities are necessarily “offering telecommunications” therefore entails mandatory common-carrier regulation of entities that the Commission *995 never classified as “offerors” of basic transmission service, and therefore common carriers, under the Computer II regime.[2] See Universal Service Report 11540, ¶81 (noting past Commission policy); Computer and Communications Industry Assn. v. FCC, 693 F. 2d 198,209 (CADC 1982) (noting and upholding Commission’s Computer II “finding that enhanced services... are not common carrier services within the scope of Title II”). We doubt that the parallel term “telecommunications service” unambiguously worked this abrupt shift in Commission policy.
Respondents’ analogy between cable companies that provide cable modem service and facilities-based enhanced-service providers — that is, enhanced-service providers who own the transmission facilities used to provide those services — fares no better. Respondents stress that under the Computer II rules the Commission regulated such providers more heavily than non-facilities-based providers. The Commission required, for example, local telephone companies that provided enhanced services to offer their wires on a common-carrier basis to competing enhanced-service providers. See, e.g., In re Amendment of Sections 6^.702 of the Commission’s Rules and Regulations (Third Computer Inquiry), 104 F. C. C. 2d 958, 964, ¶ 4 (1986) (hereinafter Computer III Order). Respondents argue that the Communications Act unambiguously requires the same treatment for cable companies because cable companies also own the facilities they use to provide cable modem service (and therefore information service).
*996 We disagree. We think it improbable that the Communications Act unambiguously freezes in time the Computer II treatment of facilities-based information-service providers. The Act’s definition of “telecommunications service” says nothing about imposing more stringent regulatory duties on facilities-based information-service providers. The definition hinges solely on whether the entity “offer[s] telecommunications for a fee directly to the public,” 47 U. S. C. § 158(46), though the Act elsewhere subjects facilities-based carriers to stricter regulation, see § 251(c) (imposing various duties on facilities-based local telephone companies). In the Computer II rules, the Commission subjected facilities-based providers to common-carrier duties not because of the nature of the “offering” made by those carriers, but rather because of the concern that local telephone companies would abuse the monopoly power they possessed by virtue of the “bottleneck” local telephone facilities they owned. See Computer II Order 474-475, ¶¶ 229, 231; Computer III Order 968-969, ¶ 12; Verizon, 535 U. S., at 489-490 (describing the naturally monopolistic physical structure of a local telephone exchange). The differential treatment of facilities-based carriers was therefore a function not of the definitions of “enhanced-service” and “basic service,” but instead of a choice by the Commission to regulate more stringently, in its discretion, certain entities that provided enhanced service. The Act’s definitions, however, parallel the definitions of enhanced and basic service, not the facilities-based grounds on which that policy choice was based, and the Commission remains free to impose special regulatory duties on facilities-based ISPs under its Title I ancillary jurisdiction. In fact, it has invited comment on whether it can and should do so. See supra, at 979.
In sum, if the Act fails unambiguously to classify non-facilities-based information-service providers that use telecommunications inputs to provide an information service as “offer[ors]” of “telecommunications,” then it also fails unam *997 biguously to classify facilities-based information-service providers as telecommunications-service offerors; the relevant definitions do not distinguish facilities-based and non-facilities-based carriers. That silence suggests, instead, that the Commission has the discretion to fill the consequent statutory gap.
C
We also conclude that the Commission’s construction was “a reasonable policy choice for the [Commission] to make” at Chevron’s second step. 467 U. S., at 845.
Respondents argue that the Commission’s construction is unreasonable because it allows any communications provider to “evade” common-carrier regulation by the expedient of bundling information service with telecommunications. Respondents argue that under the Commission’s construction a telephone company could, for example, offer an information service like voice mail together with telephone service, thereby avoiding common-carrier regulation of its telephone service.
We need not decide whether a construction that resulted in these consequences would be unreasonable because we do not believe that these results follow from the construction the Commission adopted. As we understand the Declaratory Ruling, the Commission did not say that any telecommunications service that is priced or bundled with an information service is automatically unregulated under Title II. The Commission said that a telecommunications input used to provide an information service that is not “separable from the data-processing capabilities of the service” and is instead “part and parcel of [the information service] and is integral to [the information service’s] other capabilities” is not a telecommunications offering. Declaratory Ruling 4823, ¶ 39; see supra, at 988.
This construction does not leave all information-service offerings exempt from mandatory Title II regulation. “It is plain,” for example, that a local telephone company “cannot *998 escape Title II regulation of its residential local exchange service simply by packaging that service with voice mail.” Universal Service Report 11530, ¶ 60. That is because a telephone company that packages voice mail with telephone service offers a transparent transmission path — telephone service — that transmits information independent of the information-storage capabilities provided by voice mail. For instance, when a person makes a telephone call, his ability to convey and receive information using the call is only trivially affected by the additional voice-mail capability. Equally, were a telephone company, to add a time-of-day announcement that played every time the user picked up his telephone, the “transparent” information transmitted in the ensuing call would be only trivially dependent on the information service the announcement provides. By contrast, the high-speed transmission used to provide cable modem service is a functionally integrated component of that service because it transmits data only in connection with the further processing of information and is necessary to provide Internet service. The Commission’s construction therefore was more limited than respondents assume.
Respondents answer that cable modem service does, in fact, provide “transparent” transmission from the consumer’s perspective, but this argument, too, is mistaken. Respondents characterize the “information-service” offering of Internet access as consisting only of access to a cable company’s e-mail service, its Web page, and the ability it provides consumers to create a personal Web page. When a consumer goes beyond those offerings and accesses content provided by parties other than the cable company, respondents argue, the consumer uses “pure transmission” no less than a consumer who purchases phone service together with voice mail.
This argument, we believe, conflicts with the Commission’s understanding of the nature of cable modem service, an understanding we find to be reasonable. When an end user *999 accesses a third-party’s Web site, the Commission concluded, he is equally using the information service provided by the cable company that offers him Internet access as when he accesses the company’s own Web site, its e-mail service, or his personal Web page. For example, as the Commission found below, part of the information service cable companies provide is access to DNS service. See supra, at 987. A user cannot reach a third-party’s Web site without DNS, which (among other things) matches the Web site address the end user types into his browser (or “clicks” on with his mouse) with the IP address of the Web page’s host server. See P. Albitz & C. Liu, DNS and BIND 10 (4th ed. 2001) (For an Internet user, “DNS is a must. . . . [N]early all of the Internet’s network services use DNS. That includes the World Wide Web, electronic mail, remote terminal access, and file transfer”). It is at least reasonable to think of DNS as a “capability for ... acquiring . .. retrieving, utilizing, or making available” Web site addresses and therefore part of the information service cable companies provide. 47 U. S. C. § 153(20).[3] Similarly, the Internet service provided by cable companies facilitates access to third-party Web pages by offering consumers the ability to store, or “cache,” popular content on local computer servers. See Declaratory Ruling 4810, ¶ 17, and n. 76. Cacheing obviates the need for the end user to download anew information from third-party *1000 Web sites each time the consumer attempts to access them, thereby increasing the speed of information retrieval. In other words, subscribers can reach third-party Web sites via “the World Wide Web, and browse their contents, [only] because their service provider offers the ‘capability for . . . acquiring, [storing]... retrieving [and] utilizing... information.’” Universal Service Report 11538, ¶76 (quoting 47 U. S. C. § 153(20)). “The service that Internet access providers offer to members of the public is Internet access,” Universal Service Report 11539, ¶ 79, not a transparent ability (from the end user’s perspective) to transmit information. We therefore conclude that the Commission’s construction was reasonable.
V
Respondent MCI, Inc., urges that the Commission’s treatment of cable modem service is inconsistent with its treatment of DSL service, see supra, at 975 (describing DSL service), and therefore is an arbitrary and capricious deviation from agency policy. See 5 U. S. C. § 706(2)(A). MCI points out that when local telephone companies began to offer Internet access through DSL technology in addition to telephone service, the Commission applied its Computer II facilities-based classification to them and required them to make the telephone lines used to transmit DSL service available to competing ISPs on nondiscriminatory, common-carrier terms. See supra, at 996 (describing Computer II facilities-based classification of enhaneed-service providers); In re Deployment of Wireline Services Offering Advanced Telecommunications Capability, 13 FCC Red. 24011, 24030-24031, ¶¶ 36-37 (1998) (hereinafter Wireline Order) (classifying DSL service as a telecommunications service). MCI claims that the Commission’s decision not to regulate cable companies similarly under Title II is inconsistent with its DSL policy.
We conclude, however, reasoned explanation for treating cable modem service dif *1001 ferently from DSL service. As we have already noted, see supra, at 981-9S2, the Commission is free within the limits of reasoned interpretation to change course if it adequately justifies the change.[4] It has done so here. The traditional reason for its Computer II common-carrier treatment of facilities-based carriers (including DSL carriers), as the Commission explained, was “that the telephone network [was] the primary, if not exclusive, means through which information service providers can gain access to their customers.” Declaratory Ruling 4825, ¶ 44 (emphasis in original; internal quotation marks omitted). The Commission applied the same treatment to DSL service based on that history, rather than on an analysis of contemporaneous market conditions. See Wireline Order 24031, ¶ 37 (noting DSL carriers’ “continuing obligation” to offer their transmission facilities to competing ISPs on nondiscriminatory terms).
The Commission in the order under review, by contrast, concluded that changed market conditions warrant different treatment of facilities-based cable companies providing Internet access. Unlike at the time of Computer II, substitute forms of Internet transmission exist today: “[Residential high-speed access to the Internet is evolving over multiple electronic platforms, including wireline, cable, terrestrial wireless and satellite.” Declaratory Ruling 4802, ¶ 6; see also U. S. Telecom Assn. v. FCC, 290 F. 3d 415, 428 (CADC 2002) (noting Commission findings of “robust competition ... in the broadband market”). The Commission concluded that “ ‘broadband services should exist in a minimal regulatory environment that promotes investment and innovation in a competitive market.’” Declaratory Ruling 4802, ¶5. *1002 This, the Commission reasoned, warranted treating cable companies unlike the facilities-based enhanced-serviee providers of the past. Id., at 4825, ¶ 44. We find nothing arbitrary about the Commission’s providing a fresh analysis of the problem as applied to the cable industry, which it has never subjected to these rules. This is adequate rational justification for the Commission’s conclusions.
Respondents argue, in effect, that the Commission’s justification for exempting cable modem service providers from common-carrier regulation applies with similar force to DSL providers. We need not address that argument. The Commission’s decision appears to be a first step in an effort to reshape the way the Commission regulates information-service providers; that may be why it has tentatively concluded that DSL service provided by facilities-based telephone companies should also be classified solely as an information service. See In re Appropriate Framework for Broadband Access to the Internet over Wireline Facilities, 17 FCC Red. 8019, 3030, ¶ 20 (2002). The Commission need not immediately apply the policy reasoning in the Declaratory Ruling to all types of information-service providers. It apparently has decided to revisit its longstanding Computer II classification of facilities-based information-service providers incrementally. Any inconsistency between the order under review and the Commission’s treatment of DSL service can be adequately addressed when the Commission fully reconsiders its treatment of DSL service and when it decides whether, pursuant to its ancillary Title I jurisdiction, to require cable companies to allow independent ISPs access to their facilities. See supra, at 979 and this page. We express no view on those matters. In particular, we express no view on how the Commission should, or lawfully may, classify DSL service.
* * *
The questions the Commission resolved in the order under review involve a “subject matter [that] is technical, complex, *1003 and dynamic.” Gulf Power, 534 U. S., at 339. The Commission is in a far better position to address these questions than we are. Nothing in the Communications Act or the Administrative Procedure Act makes unlawful the Commission’s use of its expert policy judgment to resolve these difficult questions. The judgment of the Court of Appeals is reversed, and the cases are remanded for further proceedings consistent with this opinion.

It is so ordered.

 IP addresses identify computers on the Internet, enabling data packets transmitted from other computers to reach them. See Universal Service Report 11531, ¶ 62; Huber 985.

 The dissent attempts to escape this consequence of respondents’ position by way of an elaborate analogy between ISPs and pizzerias. Post, at 1011 (opinion of Scaua, J.). This analogy is flawed. A pizzeria “delivers” nothing, but ISPs plainly provide transmission service directly to the public in connection with Internet service. For example, with dial-up service, ISPs process the electronic signal that travels over local telephone wires, and transmit it to the Internet. See supra, at 974-975; Huber 988. The dissent therefore cannot deny that its position logically would require applying presumptively mandatory Title II regulation to all ISPs.

 The dissent claims that access to DNS does not count as use of the information-processing capabilities of Internet service because DNS is "scarcely more than routing information, which is expressly excluded from the definition of ‘information service.’ ” Post, at 1012-1013, and n. 6 (opinion of Scalia, J.). But the definition of information service does not exclude “routing information.” Instead, it excludes “any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service.” 47 U. S. C. § 153(20). The dissent’s argument therefore begs the question because it assumes that Internet service is a “telecommunications system” or “service” that DNS manages (a point on which, contrary to the dissent’s assertion, post, at 1013, n. 6, we need take no view for purposes of this response).

 Respondents vigorously argue that the Commission’s purported inconsistent treatment is a reason for holding the Commission’s construction impermissible under Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc., 467 U. S. 837 (1984). Any inconsistency bears on whether the Commission has given a reasoned explanation for its current position, not on whether its interpretation is consistent with the statute.