# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 22, 2018            Decided July 20, 2018

No. 16-1413

NATURAL RESOURCES DEFENSE COUNCIL AND SIERRA CLUB,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY AND ANDREW
WHEELER,
RESPONDENTS

AMERICAN PETROLEUM INSTITUTE,
INTERVENOR

———

On Petition for Review of a Final Agency Action
of the United States Environmental Protection Agency

———

*Margaret T. Hsieh* argued the cause for petitioners. With her on the briefs were *Sanjay Narayan*, *John Walke*, and *Emily K. Davis*. *Nancy S. Marks* entered an appearance.

*Sue Chen*, Attorney, U.S. Department of Justice, argued the cause for respondents. With her on the brief was *Jeffrey H. Wood*, Acting Assistant Attorney General.

*Aaron M. Flynn* and *Lucinda Minton Langworthy* were on the brief for intervenor-respondent.

2

*Caroline Lobdell* was on the brief for *amici curiae* National Cattlemen's Beef Association, et al. in support of respondents.

Before: GRIFFITH and KATSAS, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: The Clean Air Act calls upon the Environmental Protection Agency to protect air quality by enforcing state and local limits on the amount of pollution. The agency need not count against those limits pollution caused by "exceptional events." In this case, Natural Resources Defense Council and Sierra Club challenge a rule the agency uses to determine whether an event caused by recurring activity is "natural," and thus "exceptional," or "caused by human activity," and thus not. 42 U.S.C. § 7619(b)(1)(A)(iii). We think the agency's rule is permitted by the Clean Air Act.

I

To "protect the public health," 42 U.S.C. § 7409(b)(1), the Clean Air Act (the "Act") established a nationwide policy for limiting air pollution on the state and local level, *id.* § 7410. The Act directs the Environmental Protection Agency (EPA) to set uniform levels of concentrations of various pollutants, National Ambient Air Quality Standards (NAAQS), that local areas must not exceed. *Id.* § 7409. Each state must earn EPA's approval of a state implementation plan (SIP), which commits the state to recording levels of specified pollutants using a network of air-quality monitors. *Id.* § 7410(a). By recording the concentration levels of these pollutants, the monitors identify areas that exceed the NAAQS. States report pollutant levels to EPA quarterly and receive from the agency "attainment" designations when the levels are below the NAAQS and

"nonattainment" designations, accompanied by additional air-quality regulations, when the levels exceed the NAAQS. *Id.* § 7407; *see also, e.g.*, 40 C.F.R. § 50.6 (establishing the NAAQS for large particulate matter, setting attainment to be exceeding a 24-hour average concentration of 150 µg/m$^3$ no more than one day within a calendar year).

Since 1977, EPA has recognized that "[f]ederal, [s]tate, and local air pollution control officials have expressed a great deal of concern" that counting emissions caused by "exceptional events" inflates reported levels of pollutants, which sometimes pushes an area otherwise in attainment to be designated as nonattainment. EPA, EPA-450/4-86-007, *Guideline on the Identification and Use of Air Quality Data Affected by Exceptional Events* 1 (1986). To avoid this, EPA suggested in a series of informal guidelines that state and federal agencies need not include in their pollution reports those pollutants emitted from exceptional events. *See, e.g.*, EPA, OAPQS No. 1.2-008, *Guideline for the Interpretation of Air Quality Standards* (1977). The agency considered events to be exceptional if "they are not expected to recur routinely at a given location, or they are possibly uncontrollable or unrealistic to control through the [SIP] process." EPA-450/4-86-007 at 1. In 2005, Congress added this practice to the Act. Act of Aug. 10, 2005, Pub. L. No. 109-59, sec. 6013(a), § 319, 119 Stat 1144, 1882-884 (codified as amended at 42 U.S.C. § 7619(b)) ("Air quality monitoring data influenced by exceptional events."). Since then, EPA has had statutory authority to exclude from a state's reported pollutant levels emissions that result from exceptional events. *Id.*

The Act sets out several requirements that events must satisfy to be exceptional. *Id.* § 7619(b)(1)(A). However, one of those requirements applies only to events "caused by human activity" and not "natural event[s]." *Id.* § 7619(b)(1)(A)(iii)

("[A]n event [must be] caused by human activity that is unlikely to recur at a particular location or a natural event."). Through notice-and-comment rulemaking, EPA proposed that "natural events" include events that are caused by both natural and human activity, so long as such human activity complies with relevant environmental regulations. Treatment of Data Influenced by Exceptional Events, 80 Fed. Reg. 72,840, 72,854 (Nov. 20, 2015). Natural Resources Defense Council and Sierra Club (together, the "environmental groups") objected to the definition, arguing that an event caused by human activity cannot be a natural event. EPA replied that "there is not always a bright line" between natural and human-caused events, J.A. 135, and adopted the definition as a final rule, Treatment of Data Influenced by Exceptional Events, 81 Fed. Reg. 68,216 (Oct. 3, 2016) ("2016 Rule").

The environmental groups filed a timely petition for review in our court,[1] and we have jurisdiction to review the 2016 Rule for compliance with the Act. *See* 42 U.S.C. § 7607(b)(1). The American Petroleum Institute (API) moved to intervene on behalf of EPA but failed to show the required Article III standing. *See Deutsche Bank National Trust Co. v. FDIC*, 717 F.3d 189, 193 (D.C. Cir. 2013). API claims representational standing,[2] API Mot. to Intervene 6 n.2, but that

---

[1] Although an EPA rule previously defined "natural event" in 2007, the 2016 Rule reopened the issue. *See Sierra Club v. EPA*, 551 F.3d 1019, 1024 (D.C. Cir. 2008).

[2] An association has standing on behalf of its members when: "(1) 'its members would otherwise have standing to sue in their own right'; (2) 'the interests it seeks to protect are germane to the organization's purpose'; and (3) 'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 596 (D.C. Cir. 2015) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

requires "specifically identify[ing] members who have suffered the requisite harm," *Chamber of Commerce of the U.S. v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011) (citations and internal quotation marks omitted). Nowhere in its motion or brief does API identify a single member of its organization or support with evidence its vague assertion that an adverse result in this case will injure any member. Because API failed to establish the constitutional standing required to participate as an intervenor, we instead grant it the status of amicus curiae. *See* Fed. R. App. P. 29(a); *see also Old Dominion Elec. Coop. v. FERC*, 892 F.3d 1223, 1232-34 (D.C. Cir. 2018); *Rio Grande Pipeline Co. v. FERC*, 178 F.3d 533, 539 (D.C. Cir. 1999).

We now consider whether the Act's exceptional-event provision permits EPA to attribute emissions to natural causes when they were also caused by regulated human activity.

II

The Act allows areas to keep their attainment designations when their pollutant levels exceed the NAAQS so long as those emissions resulted from an exceptional event. An exceptional event is one that "affects air quality," is "not reasonably controllable or preventable," and is "caused by . . . activity that is unlikely to recur at a particular location." 42 U.S.C. § 7619(b)(1)(A). But even a recurring event can be "exceptional" if it is a "natural event." *Id.* § 7619(b)(1)(A)(iii).

The Act does not give a definition for "natural event," so EPA defined it in the 2016 Rule:

[A natural event is] an event and its resulting emissions, which may recur at the same location, in which human activity plays little or no direct causal role. For purposes

of the definition of a natural event, anthropogenic sources that are reasonably controlled shall be considered to not play a direct role in causing emissions.

81 Fed. Reg. at 68,277 (codified at 40 C.F.R. § 50.1(k)). In other words, to determine whether a recurring event is natural, and thus exceptional, EPA looks at the activities that caused the emissions. *See id.* at 68,232 (explaining that EPA classifies events based on the underlying sources of their emissions). When making this decision, EPA will disregard contributions to the emissions made by human activities, or "anthropogenic sources," that "are reasonably controlled" by complying with emissions regulations.[3] As a consequence, an event is natural if it resulted from at least some natural activity and any amount, no matter how significant, of reasonably controlled human activity. *See id.* at 68,231 (explaining that an event cannot be "natural if all of the event-related emissions originated from anthropogenic sources").

According to the environmental groups, this approach stretches the meaning of "natural event" beyond what the text of the Act can bear. They concede that, in some circumstances, the Act permits EPA to classify an event and its resulting emissions as natural even though human activity played a small role. However, they contend that EPA must count, for the purposes of characterizing an event as natural, the role played by both types of human activity—that which complies with environmental regulations and that which does not.

We review EPA's definition of natural event under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984): "If the Act unambiguously

---

[3] In general, "reasonably controlled" means that the human activity satisfied the relevant SIP standards. 40 C.F.R. § 50.14(b)(8)(v).

authorizes or forecloses EPA's . . . rule, step one of the *Chevron* analysis requires that we follow Congress's express policy choice. If the Act is unclear on the matter, step two of *Chevron* requires that we defer to EPA's reasonable interpretation." *Sierra Club v. EPA*, 536 F.3d 673, 677 (D.C. Cir. 2008) (citing *Chevron*, 467 U.S. at 842-43).

At step one, we consider whether the Act issued unambiguous instructions for distinguishing natural events from events caused by human activity. Outside its statutory context, "natural" ordinarily means something unaffected by human activity. *See, e.g.*, Merriam-Webster's Collegiate Dictionary 774 (10th ed. 1997) (defining natural as "growing without human care . . . existing in or produced by nature: not artificial"); Oxford English Dictionary Online, http://www.oed.com/view/Entry/125333 (3d ed. 2003) (defining natural as "[f]ormed by nature; not subject to human intervention, not artificial"); Black's Law Dictionary 1048 (7th ed. 1999) (defining natural as "[b]rought about by nature as opposed to artificial means"). And an ordinary reading of "natural event" summons images of natural disasters such as tornados and volcanic eruptions; cosmic episodes, such as comets and harvest moons; and organic processes, such as viral epidemics and seasonal changes. These examples leave little room for human causation.

But what "natural event" means in the Act does not depend entirely on its ordinary reading because "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 666 (2007) (internal quotation marks omitted); *see also Pereira v. Sessions*, 138 S. Ct. 2105, 2110 (2018) (interpreting the statute in light of its statutory context). By pairing "natural event" alongside "an event caused by human activity," the Act uses the phrase as a

tool to separate events into the two categories, requiring it to carry a special meaning. Perhaps if EPA had to separate only those events caused by either solely natural or solely human activity, the ordinary understanding of "natural event" might do the trick. But many events are caused by a combination of the two. For example, consider a windstorm that sweeps dust into the air so that it is emitted as small particulate matter, which is subject to the NAAQS. At first blush, the emissions appear to be the result of the windstorm and, therefore, a natural event. But this is less obvious if the storm swept up the dust only because the ground's surface had been loosened by recent construction. *See* 80 Fed. Reg. at 72,854 n.34. In that case, the natural event caused the emissions only because human activity changed the landscape. The point at which human contributions convert a natural event into one caused by human activity is blurry at best.

But EPA must draw that line, and the Act provides little guidance beyond establishing that the distinction exists.[4] *See* 42 U.S.C. § 7619(b)(1)(A)(iii) (allowing an event to be exceptional only if it is "natural" *or* "caused by human activity that is unlikely to recur at a particular location"). Many possible rules for sorting events may be permissible under the statute. Some may be easier to administer than others, but the Act leaves the choice to EPA. The statutory language is far from unambiguous and is, instead, a classic example of Congress leaving a gap for EPA to fill with reasonable regulations. *See Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005) ("[A]mbiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion."); *Chevron*, 467 U.S. at 843-44.

---

[4] The Act also provides broad governing principles, such as the supremacy of public health, that could place some limits on EPA's choice of rules. *See* 42 U.S.C. § 7619(b)(3).

It is at *Chevron* step two that we determine if the 2016 Rule "fill[s] the statutory gap in reasonable fashion." *Brand X*, 545 U.S. at 980. The environmental groups think the rule upends the statutory distinction between natural events and those caused by human activity. They contend it is unreasonable for EPA to assume that human activity did not cause an event simply because that activity complied with environmental regulations. As a consequence, they worry, EPA will treat emissions from recurring human activity as emissions from an exceptional event.

To illustrate their concern, they describe how the 2016 Rule would apply to a windstorm that blew pollutants emitted from a reasonably controlled power plant to another jurisdiction's air-quality monitor, which then registered a much higher pollutant concentration than would be typical for that area. The environmental groups argue that EPA would consider the emissions to be the result of a natural event. Although human activity produced the emissions, they believe EPA would not consider the role played by the power plant because it complied with the relevant air-quality regulations. Instead, EPA would look to only the windstorm and conclude that the event was natural.

But such an outcome wouldn't be possible under the statutory and regulatory safeguards in place. The environmental groups do not challenge EPA's understanding that an "event" must be an occurrence that "deviat[es] from normal or expected conditions." 81 Fed. Reg. at 68,228. Emissions that result from only "routine" activity cannot be treated as exceptional-event emissions. *Id.*

The environmental groups seem to suggest that emissions from "routine" activities could become emissions from an

"event" if they are later affected by unexpected activity. However, this misreads the 2016 Rule. "*Natural event* means an event and its *resulting* emissions," 40 C.F.R. § 50.1(k) (second emphasis added), and EPA has made clear that emissions only *result* from the events that generate them, 81 Fed. Reg. at 68,226.[5] Activities that cause emissions to behave in a certain way, such as migrating to new areas or concentrating in dangerous amounts, are not events that cause the emissions. *Id*. In the windstorm example, it was the power plant and not the windstorm that generated the emissions. Although the pollutants only reached the monitor because they were carried by the windstorm, they were emitted into the air before the wind arrived at the scene. Under the 2016 Rule, those emissions would be attributed to the power plant, not the natural activity of the windstorm.[6]

The agency would give a different answer for emissions generated by a windstorm that swept up particulate matter from a dirt road. In that case, no pollutants would be emitted until the wind struck the road and swept particles into the air. If the road were reasonably controlled, EPA would discount the

---

[5] To the extent the environmental groups are challenging EPA's interpretation of its own regulations, we defer to the agency's understanding. *See Auer v. Robbins*, 519 U.S. 452, 461 (1997) (holding that an agency's interpretation of its own regulation, unless "plainly erroneous or inconsistent with the regulation," controls (internal quotation marks omitted)). Even if the regulation could be read to include emissions that have already been generated, EPA's reading is certainly consistent with the 2016 Rule.

[6] This does not mean that emissions produced by human activity and transported by wind to a new area can never be the result of an exceptional event. It simply means that EPA would treat them as a result of human activity and consequently subject to the recurrence condition for exceptional events. *See, e.g.*, 81 Fed. Reg. at 68,280 (discussing "emissions-generating activity that occurs outside of the State's jurisdictional boundaries").

road's role and look only to the windstorm. But if the road had been improperly maintained, EPA would consider both the road's and the windstorm's contributions to the emissions.

We think the 2016 Rule preserves the Act's distinct treatment of natural events. Although we recognize the possibility raised, but not demonstrated, by the environmental groups that extreme and unforeseen applications of the rule might have problematic results, the 2016 Rule still passes muster under *Chevron* step two. The "possibility that the rule, in uncommon particular applications, might exceed EPA's statutory authority does not warrant judicial condemnation of the rule in its entirety." *EPA v. EME Homer City Generation, L.P.*, 134 S. Ct. 1584, 1609 (2014); *see also Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 699-700 (1995) (upholding a rule as reasonable despite possible applications that would be impermissible under the statute). If EPA applies the rule in a way that the Act would not permit, an injured party can petition us to review the agency's action at that time. *See EME Homer City*, 134 S. Ct. at 1609 (explaining that as-applied challenges remain available if EPA were to apply a rule, which the Court had upheld under *Chevron*, in a way that was impermissible under the statute); *Util. Air Regulatory Grp. v. EPA*, 885 F.3d 714, 723 (D.C. Cir. 2018). For now, we uphold the definition of natural event against the environmental group's facial challenge to the 2016 Rule.

## III

We deny the petition for review because the 2016 Rule's definition of natural event is permissible under the Act.

*So ordered.*