OPINION
 I. INTRODUCTION
This matter is before the court after a trial. The question is the propriety of the actions of Defendant (the department) in assessing Plaintiff (Comcast) under ORS 308.505 to ORS 308.665 (the central assessment statutes)[1] in respect of property employed by Comcast in cable television and internet access businesses.[2]
 II. FACTS
Although substantial time was spent in the trial for the apparent purpose of establishing certain facts, the relevant facts are relatively few in number:
 1. The property in question is owned by one or more corporations in a family of companies that will be referred to as Comcast. (Transcript at 389-90.)
 2. The property consists of certain real properties, tangible personal *Page 2 
properties and intangible personal properties. (Transcript at 14.)
 3. Through the use of these properties Comcast engages in three businesses: a cable television business, an internet access business and a voice over internet (VOIP) business. (Transcript at 137.)
 4. Many of the major tangible personal properties and real properties are used in some way in all three businesses. Assets used in the VOIP business have been reported and assessed under the central assessment statutes. (Transcript at 393.)
 5. Measured by number of customers, revenues and capacity of bandwidth used, the cable television business is by far the dominant business operation in which the property in question is used. The primary use of the assets in question in this case is in the cable television business. (Transcript at 60.)
 6. As to the cable television business, the content transmitted to the customers of Comcast is either owned by Comcast or Comcast obtains the rights to transmit that content to its customers. Very substantial payments are made in respect of such rights to transmit the content produced or owned by others. (Def's Exs CCC at 6; DDDD at 4.)
 7. Although much, if not most, of the communication between Comcast and its customers in the cable television business is a one way communication from Comcast to the customer, there are interactive features in that relationship in which the customer communicates with Comcast. Those features are, however, secondary in that they exist to facilitate the primary activity of communication from Comcast to the customer. (Transcript at 930-32.)
 8. The cable television business and the internet access business each involve the communication of data. (Transcript at 925.)
 9. The internet access business of Comcast involves facilitation of data transmission from or to a customer. That data is data belonging to the customer of Comcast or data belonging to some third party, or data as to which the right to transmit has been acquired by the customer of Comcast or the third party. (Transcript at 759.)
Certain other facts will be discussed where appropriate in the analysis of the issue in this case.[3] *Page 3 
 III. ISSUE
The issue in this case is the propriety of the actions of the department in subjecting Comcast and the properties it employs in the cable television and internet access businesses to the central assessment regime of ORS 308.505 to ORS 308.665.
 IV. ANALYSIS
ORS 308.515(1) provides in relevant part:
 "(1) The Department of Revenue shall make an annual assessment of any property that has a situs in this state and that, except as provided in subsection (3) of this section, is used or held for future use by any company in performing or maintaining any of the following businesses or services or in selling any of the following commodities, whether in domestic or interstate commerce or in any combination of domestic and interstate commerce, and whether mutually or for hire, sale or consumption by other persons:
 "*****"
 "(h) Communication."
ORS 308.505(3) provides:
 "`Communication' includes telephone communication and data transmission services by whatever means provided."
The stated definition of "communication" and the inclusion within that definition of "data transmission by whatever means provided" was added to the statute in 1973. See Or Laws 1973, ch 102, § 1.
As with most tax cases, this case must be resolved by determining what the legislature intended in stating that communications businesses would be subject to central assessment and that "communications" included not only "telephone communication services" but also "data transmission services by whatever means provided." Prior to that addition, the scope of the *Page 4 
central assessment statutes as to such matters was limited to companies providing "telephone communication" and "telegraph communication."See Or Laws 1973, ch 102, § 2.
Of course the central assessment statutes applied to a number of other types of business that were generally, but not necessarily, public utility businesses. However, prior to 1973, no language even remotely suggested that operations of the type at issue here would be subject to central assessment.
At the outset it is quite important to discuss what it means to be subject to central assessment. From time to time some have suggested that central, as opposed to local, assessment is simply a matter of which level of government does the assessing. That is by no means the most important distinction. Rather, central assessment results in consideration and assessment of value attributable to intangible personal property whereas local assessment does not expose such property to assessment. See ORS 307.030(2). As demonstrated in this case, the difference can be extremely significant in terms of the value of property and the total tax bill. If a company is described in ORS 308.515, the taxes assessed and levied against all centrally assessed property of the company, whether real or personal, are a debt of the company and not just a lien on the property. ORS 311.655(1). Taxpayers who are not centrally assessed have personal liability only for taxes on personal property, with taxes on real property being only an in rem obligation. Compare ORS 311.655 with ORS 311.455.
A. The Development of the Department Position and Its Problems
After amendment of ORS 308.505 and ORS 308.515 in 1973, the department did not, until the 2009-10 tax year, attempt to subject cable television service or internet access service to central assessment. In the late 1980s the Douglas County assessor attempted to subject intangible property of a cable television company to taxation. That action was successfully *Page 5 
challenged by a predecessor of Comcast in Jones Intercable, Inc.,v. Dept. of Rev., 12 OTR 436 (1993).[4]
 Jones Intercable is interesting and important for two reasons. First, although the court stated a conclusion that cable television was not the type of business subject to central assessment, that conclusion was dicta. At issue was an action of a county assessor, not the department. There was little question that no county assessor had authority to subject intangible property to taxation in contravention of ORS 307.030(2). That could only be done in a central assessment proceeding, a proceeding involving the department. No such proceeding had occurred. Second, in reaching its conclusion on this point, the court took note of recent activity in the Oregon legislature on the very question of taxation of cable television companies as centrally assessable companies. See Jones Intercable,12 OTR at 439.
That legislative activity was centered on the unsuccessful attempt to have the legislature amend ORS 308.505 so as to state that cable television properties were subject to central assessment. See
HB 2556 (1991) (HB 2556). The legislation was introduced at the request of the county that had unsuccessfully attempted to subject intangible property of such companies to taxation in the matter that led to the decision in Jones Intercable.
As will be discussed below, the testimony and total committee consideration for the amendments adopted in 1973 was extremely short and limited. That was not true of the consideration given to HB 2556 in the 1991 session of the legislature. There was significant testimony and material submitted to the legislative committees considering the proposed amendment. The department supported the amendment. It is important to note that the *Page 6 
amendment, which did not become law, would have authorized the actions that the department seeks to take in this case solely on the basis of agency action and a litigating position.[5]
The department attempts to take the sting out of the events of 1991 by citing to cases that indicate that action or inaction of a later legislature cannot be relied upon to arrive at a conclusion as to the intent of an earlier legislature. (Def's Post-Trial Br at 48.) Be that as it may, the court cannot simply disregard the events of 1991. The actions and words of the legislators and of the persons appearing before the legislature are not consistent with a conclusion that cable television was already subject to central assessment under the statute as amended in 1973. There is no testimony or legislative discussion indicating that the amendment proposed in 1991 was simply a clarification of existing law. Quite to the contrary, the legislature was told about the Jones Intercable case, then pending before this court. (Ptf's Ex 52 at 260-263.) The actions of the department in the 1991 proceedings were in no way consistent with its current position that it has authority to subject cable television to central assessment solely by reason of the 1973 amendments.
During the early years of this century the department engaged in a series of internal meetings and discussions regarding extending central assessment to cable television and internet service companies. (Transcript at 199.) Beginning in 2005 public meetings took place on this subject and drew strong opposition from potentially affected taxpayers. During 2006 representatives of the department decided that the department should notify the legislature that the definition of "communication" in ORS 308.505 was ambiguous and that the legislature should act to clarify the ambiguity. (Transcript at 220; Ptf's Ex 48.) In 2006 representatives of *Page 7 
the department appeared before a meeting of the House Interim Revenue Committee and informed the committee as follows:
 "The Department of Revenue has conducted a review of the law and recent emerging communication technology, and plans to align its assessment responsibility between central and local assessment accordingly, beginning with either the 2008 or 2009 tax year. This will result in the department assuming appraisal responsibility for cable companies and internet service providers that are now locally assessed."
(Def's Ex FFFF at 13.) As the court has already noted, the foregoing statement is of the type that suggests that central assessment involves a question of which institution of government conducts an assessment. The statement of the department representative in 2006 does not, in any way, indicate that central assessment also involves extremely significant expansion of what property is subject to taxation, increases in tax obligations and creation of personal liability for taxes levied on the property. The statements of the department to the committee were incomplete in critically material ways.
Neither the House Interim Revenue Committee meeting during 2006 nor any committee of the legislature in subsequent years has taken any action to clarify or change the language of the relevant statutes beyond their provisions following the 1973 amendments.
In 2009 the legislature visited the provisions of ORS 308.505(2) for the purpose of removing from that subsection the reference to telegraph services. See Or Laws 2009, ch 128 § 3.
Without further legislative guidance, in 2008 the department proceeded to adopt OAR 150-308.515(1)(h) (the cable television rule) which provided that cable television services and internet access services provided by cable companies were communication services for purposes of the central assessment statutes. The rule has been invalidated by the Oregon Court of Appeals on the basis of failure by the department to follow the correct rule making procedures. See *Page 8 Oregon Cable Telecommunications v. Department of Revenue,237 Or App 628, 240 P3d 1122 (2010).
The department proceeds in this case to assert the substance of the cable television rule as a litigating position in defense of its assessment actions. While it may do so, the propriety of its substantive position is subject to judicial review. The court now turns to the substance of the position of the department.
Without exaggeration, it appears that the position of the department is that "data transmission," a component of the definition of "communication" includes whatever the department says it includes, so long as the tremendously broad and expansive definitions of "data" and "transmission" are arguably applicable.[6]
(See Def's Post-Trial Br at 35-36.) At the hearing on this matter counsel for the department stated that data transmission "could" include books, magazines and broadcast television. (Transcript at 1138.) Further, witnesses for the department were unable to articulate any set of criteria — even criteria established by the department alone — that could have been employed to include cable television and internet access in the category of centrally assessed property while at the same time not including several other operations involving data transmission.
The department has been unable to articulate any limiting principle or standard by which its exercise of interpretive authority would be judged, other than dictionary definitions of broad *Page 9 
terms or views of expert witnesses from fields to which the legislature made no reference.[7] That might not be a problem if the legislature had invested in the department legislative rule making authority constrained by standards or criteria set by the legislature.[8]
However, the statute at issue here contains no explicit standards or criteria providing a meaningful limitation on the authority of the department, at least none recognized by the department.
Without a standard or limiting principle, serious constitutional problems of delegation of legislative power are presented. This is especially so when taxation is involved. Beyond general concerns as to delegation, Article I, section 32, of our Oregon Constitution specifically allocates to the legislature and the people, alone, the power to impose taxes.[9] The department's position would, in effect, have the executive branch of government make legislative choices as to which activities within the extremely broad collection of communication services are subject to central assessment and which are not.[10] The doctrine of avoidance requires this court to consider constructions of the statute that would give effect to the provisions of the statute in question without presenting constitutional difficulty. See PlannedParenthood Assn. v. Dept. of Human Res.,297 Or 562, 564-65, 687 P2d 785 (1984). *Page 10 
B. The Comcast Position and Its Problems
Comcast appears to be urging a construction of the statute that would limit the coverage of "data transmission by whatever means provided" to those point-to-point microwave transmission services of a type that was in the process of being introduced into this state at or about the time of the 1973 amendments. (Ptf's Post-Trial Br at 59.) Comcast argues, essentially, that the statutory term is a reference to a particular technological form of data transmission. From that definitional premise, Comcast easily distinguishes its technology of coaxial and fiber optic cable transmission from point-to-point microwave data transmission.
Elsewhere Comcast appears to argue that the 1973 amendments were only designed to subject to central assessment point-to-point microwave services providing telephone communications. (Ptf's Post-Trial Br at 15-16.) If that had been the intent of the legislature, it could have much more directly achieved its goal by simply adding a phrase qualifying the existing reference to telephone services and designating that central assessment applied to "telephone communication service, by whatever means provided." Comcast's position would thus, improperly, render the words "data transmission" meaningless or unnecessary. In addition, there seems to the court to be little doubt that the legislature intended to legislate such that future technological developments did not render its work obsolete.
For these reasons, the major thrust of the arguments made by Comcast cannot be accepted.
C. Resolution of the Matter
The text of the statutory language itself supplies one indication of a resolution of the difficulties presented by the interpretations of Comcast and the department. That which is included within the central assessment process is not "data transmission" but rather "data transmission services." That distinction has significance within ORS 308.515, a statute that *Page 11 
applies to companies "maintaining" certain listed "businesses," to companies performing certain "services," and to companies "selling" certain "commodities." In the opinion of the court, this limits the application of the statute to instances where the entity executing the transmission of data is doing so for another — that is, performing a service, typically for a fee.
This construction places "data transmission services" within the general scope of the central assessment statutes — statutes that apply to businesses providing services or commodities to others, as opposed to consuming commodities or services for their own account. For example, while air transportation is listed in ORS 308.515(1)(e), no one would appear to suggest that transporting one's own inventory by air to other locations would mean that the taxpayer was engaged in the air transportation business or service. Providing air transportation to others, on the other hand, does render one subject to the statutory scheme. Nor would anyone suggest that consumption of gas in a business rendered the business, potentially a centrally assessed business. Selling gas to others is, however, subject to the statutory scheme.[11]
The central assessment statutes are properly seen as applying to companies that sell transmission services but not to companies selling data and transmitting that data to a customer as part of the sale.
Such a construction is entirely consistent with the background and context within which the legislature acted in 1973. Telephone and telegraph had been, in 1973, the dominant technologies for the transmission of voice and information in coded form for others and for a fee. However, the technology was used to transmit the information of the customer and not the information of the company potentially subject to central assessment. *Page 12 
Rulings of the Federal Communications Commission (FCC) had opened up the market for competition with the telephone companies from providers of point-to-point microwave communication services. See,e.g., In Re Microwave Communications, Inc., 18 FCC 2d 953 (1969) (MCI); In Re Specialized Common CarrierServices, 24 FCC 2d 870 (1971). Such providers also transmitted information, for a fee, by means of point-to-point electronic signaling.MCI, 18 FCC 2d at 953-54. But the information was that of the customer and not information that the providers were selling to the customer. Id. The legislative history makes clear that the legislature was told the purpose of the language at issue in the 1973 amendments was to permit taxation of companies offering microwave communication services as centrally assessed properties and place these companies on the same footing as the telephone and telegraph companies. (Ptf's Ex 51 at 27, 31.) There were specific references to the immediate targets of the legislation and those targets were the providers of microwave communication services then in the process of building out their systems along the west coast.
The discussion in hearings on the amendments in question was quite limited, consisting exclusively of discussions among legislators and a representative of the department. (See Ptf's Ex 51 at 27-31.) However, in the course of the discussions an unnamed senator, apparently concerned about the breadth of the term "data transmission" asked the department representative:
 "All I know about it is what I've seen advertised that kind of thing but you're talking about my company communicating with a branch of my company somewhere else."
The department representative answers:
 "Exactly."
The senator continues:
 "Now, let's presume I am not a centrally assessed as a company, you would centrally assess that portion of my company?" *Page 13 
The department representative answered:
 "If it's to serve your company only[,] [n]o. This wouldn't constitute a utility under the statute-it wouldn't be offering this service for hire which is another part of the definition here. The company providing these communication services must offer them to the general public for a fee."
(Ptf's Ex 51 at 28.) The foregoing discussion and the structure of the statutes at the time is consistent with a conclusion that offering a transmission service to the public is qualitatively different from offering the transmitted content to the public for a fee. If the legislature meant to subject to central assessment any business supplying data to the public, it would have simply added the work data to the statutory list of commodities, the sale of which attracts central assessment under ORS 308.515(1). That word, like the word "gas" in subsection (j) of the statute would have related back to the phrase "in selling any of the following commodities." Instead, in using the term "data transmission services" the legislature must have been referring not to the predicate word "commodities," but rather to the predicate words "the following businesses or services." Comcast here sells content to its customers and delivers the content over its system. A retailer sells products to customers and may deliver those through the use of railroads or air express. The mode of delivery does not convert the retailer into a railroad under subsection (1)(a) of the statute or an air express company under subsection (1)(g) of the statute. Given this legislative history, it seems clear that central assessment is only to apply to those who render communication services to others — that is, transmit the data of others for a fee. Nothing in the legislative discussions even remotely suggests that the legislators considering the amendments were focused on companies that delivered their own data to customers as a part of conducting their own business.
This distinction is also consistent with the fact that the legislature was presented with amendments that purported to level the playing field with the existing central assessment of *Page 14 
telephone and telegraph companies. That playing field involved, however, only companies that transmitted content created by others or content that others had a right to transmit. Against that background it would be an unwarranted extension to engage in a leveling process that expanded central assessment to companies that transmit their own content or content they have the right to transmit. There was no central assessment of companies selling their own content and therefore no need to level any field by extending the central assessment process to any new form of content provider.
As far as the use of the terms "by whatever means provided," the witness for the department indicated that broad language was appropriate because it would be difficult to anticipate future technological developments. (Ptf's Ex 51 at 27.) However, no testimony led the legislature to believe that the language in question would bring within the central assessment process businesses that did not transmit data for others but only transmitted their own data or data, the rights to publication of which they had obtained. The phrase "by whatever means provided" dealt with the "how" of the transmission and not the "what" of the transmission.
This points to a troublesome aspect to the presentation that the representative of the department made to the legislative committees in 1973. There is not only no discussion of the proposed language reaching persons who use their own transmission systems to transmit content to a customer, there is no discussion of the fact that "communication" companies, including "data transmission service" companies will henceforth be subject to taxation of their intangible personal property. The department's representative carries on the discussions with the legislators entirely as if the only issue is whether the assessment is locally conducted as opposed to conducted by the department. As mentioned above, something of a repeat performance of this *Page 15 
approach occurred also when the department spoke to the House Interim Revenue Committee in 2006.
The court therefore concludes that the 1973 amendments must be read as subjecting to central assessment only those properties employed in transmitting the customer's data to another location of the customer or to another party. Even if the statute is to be read as not limited to data transmission services but as inclusive of other communication, the court is of the opinion that the communication must be the service of transmitting the data of the customer and not transmission of the taxpayer's own data. What the legislature intended was that persons who sell to other persons the ability to have the content of such otherpersons communicated, whether to another location of the customer or to some third party, will be subject to central assessment.
The phrase "data transmission services," if defined as services provided to others, has some limit. It is a limit implied by and derived from the language and history of the statute. On the other hand, if anyone engaged in data transmission is potentially subject to central assessment, depending only on when the department chooses to assert the position, there is no principled limit on the meaning of the terms. That result is inconsistent with Article I, section 32, of our Constitution that allocates to the legislature or the people the power to impose taxes.
D. Application to This Case — Cable Television
Under the foregoing analysis, the cable television business of Comcast is not a communication business or a data transmission business within the meaning of ORS 308.505(2). Comcast does not, in providing this service, transmit data or content created by the customer or as to which the customer has the right to make transmission. Instead, the data transmitted is either data created by Comcast or data as to which Comcast has obtained the right to make transmission to a third party. *Page 16 
At one point in its argument, the department stated that an important fact that distinguished Comcast from other data transmitters who have not been centrally assessed is that Comcast also receives communications from its customers in the interactive processes that are part of the service. (Def's Post-Trial Br at 67-69.) Even if that standard, created solely by the department without adherence to any legislative standards or criteria, was relevant, the record shows that these communications from Comcast's customers back to Comcast are secondary to or an auxiliary to the primary relationship in which Comcast delivers Comcast's content to the customer.[12]
The cable television services of Comcast are not services that expose the property related to them to central assessment, at least not by reason of those services alone.
E. Application to This Case — VOIP
One corporate member of the Comcast family of companies already reports as a centrally assessed taxpayer in respect of its "voice over internet" or VOIP services. Such treatment is consistent with the construction of the statute arrived at above. The VOIP service provider is transmitting content of the customer to someone else and perhaps a return communication. The record indicates, however, that a separation is maintained between the affiliate providing VOIP services and the cable television and internet access services of Comcast. The VOIP provider obtains use of cable facilities under contracts between it and the owner of the cable facilities.
F. Application to This Case — Internet Access
The remaining question in this portion of the analysis is whether the internet access business constitutes a data transmission service. In light of the court's analysis of the proper *Page 17 
construction of ORS 308.505(2), the question is whether the internet access business is a service offered to others to allow transmission of data of such customer to some other point or location or person.
Comcast has placed great reliance on a decision in the case ofNational Cable Telecommunications Association v. Brand X InternetServices,545 US 967, 125 S Ct 2688, 162 L Ed 2d 820 (2005) (Brand X). The decision contains a description of the processes of high speed cable internet such as found at issue in this case. Neither party disputes those factual descriptions. Indeed, each party essentially adopts them. That discussion indicates that such internet access, referred to as broadband internet service involves transmission of data at much higher speeds than by use of more traditional telephone modem. Broadband service through cable modem, the technology at issue in this case, transmits data between the internet and a customer's computer via the network of television cable lines owned by the cable company. In this fashion, cable companies can provide internet access directly to consumers. Brand X, 545 US at 975.
The legal analysis in Brand X is not relevant to this case, however. The Brand X decision involved a construction of the Telecommunications Act by the Federal Communications Commission. The opinion gives great deference to the agency construction under the so-called Chevron doctrine. See Chevron U.S.A., Inc. v. NaturalResources Defense Council, Inc.,467 US 837, 104 S Ct 2778, 81 L Ed 2d 694 (1984). No such doctrine is applicable in this case. Rather, the court must be concerned with the intent of the legislature. Further, the statutory language that the FCC was interpreting in Brand X and the related prior court and agency interpretations are in no way similar to the constructional problems in this case. *Page 18 
Both the description of cable internet service in Brand X and the record in this case show that the service in question here is as described in the Brand X decision. (See Def's Post-Trial Br at 58.) That service is one of transmitting data of a customer or a third party, but not data of Comcast. That data may be an internet message sent by a customer to some other person or a data message that permits the customer to interact with a website. The data in question, unlike that involved in the cable television business, is not data created by Comcast or data as to which the Comcast has publication rights.
Comcast argues that the actions of the 1973 legislature were limited to only point-to-point transmission — a service that predated the development of broadly available internet services. (Ptf's Post Trial Br at 74.) As stated above, the starting point of this argument is that the 1973 legislature meant to address only certain technologies employed in the transmission of data. The court must reject that argument. The information transmitted through or by way of the services offered by Comcast is "data" under any acceptable definition. The business of Comcast is to transmit that data — data of the customer or a third party — for a fee. The court concludes that the internet service is a form of "data transmission service" within the meaning of ORS 308.505(2).
G. Primary Use
What remains to determine is whether the primary use of the assets in question is in one or more businesses subject to central assessment. ORS 308.510(4) provides:
 "(4) Property found by the Department of Revenue to have an integrated use for or in more than one business, service or sale, where at least one such business, service or sale is one enumerated in ORS 308.515, shall be classified by the department as being within or without the definition of property under ORS 308.505, according to the primary use of such property, as determined by the department." *Page 19 
The record made by Comcast fully supports the conclusion that, in the year at issue, the primary use of Comcast's property was in connection with the cable television business. Whether measured in terms of relative bandwidth employed in the business, number of customers or the revenues derived, the cable television business far surpasses the VOIP and internet service businesses. (See Ptf's Ex 4 (bandwidth);see also Ptf's Exs 7, 65, 66 (revenues).) Although the department made some indirect arguments as to these issues in its objections to the proposed factual finding put forth by Comcast, the department simply did not argue the primary use position in this trial.[13]
ORS 308.510(4) requires that where the department finds an integrated use of assets in more than one business and at least one such business is subject to central assessment, the department must also determine the primary use of the property.[14] In this case, the position of the department was that all businesses in which the assets in question are used are subject to central assessment. The department did not therefore proceed with any determination as to integrated use or primary use. The department never confronted what the proper outcome would be under ORS 308.510(4) if only the internet business was found, in this proceeding, to be subject to central assessment. That use would, it appears, be combined with the VOIP use of the properties in question and then compared to the cable television operations. *Page 20 
Given the record made in this case, the provisions of ORS 305.487 and the tactical decision by the department to forego development of alternative positions in this case, the court sees no reason to remand this matter to the department, a step the department does not even request in its briefs. The court believes it is both appropriate and in the interest of all parties to reach a conclusion, especially where the parties had an opportunity to make a record on integrated use and primary use.
 V. CONCLUSION
The court concludes that the assets in question have uses that are integrated and one or more of such uses, but not all such uses, are subject to central assessment. The court also concludes that the primary use of the properties for the year at issue is in the cable television business. That primary use does not render the properties or the owner of any of the properties subject to the central assessment regime of ORS 308.505 to ORS 308.665.
Accordingly, the actions of the department for the year in question must be set aside. The resolution of the case on this basis makes it unnecessary to, and the court does not, address the other challenges made by Comcast to the actions of the department. Now, therefore,
IT IS THE DECISION OF THIS COURT that Defendant's actions in central assessment of Plaintiff's property for tax year 2009-10 be set aside; and
IT IS FURTHER DECIDED that appropriate refunds be made to Plaintiff; costs awarded to Plaintiff.
Dated this ___ day of August, 2011. *Page 21 
 THIS DOCUMENT WAS SIGNED BY JUDGE HENRY C. BREITHAUPTON AUGUST 10, 2011, AND FILED THE SAME DAY. THIS IS A PUBLISHEDDOCUMENT.
[1] Unless otherwise noted, all references to the Oregon Revised Statutes (ORS) are to 2009.
[2] The Comcast group of companies consists of several separate corporations and business entities. That corporate structure is not particularly relevant as the central assessment statutes address both ownership and use of property.
[3] The department places significant emphasis on descriptions of Comcast's cable and internet businesses contained in internal and external publications of Comcast. (Def's Post-Trial Br at 6-20.) The court finds that these publications are not controlling as to the facts of this case. The department would not be bound by taxpayer characterizations of properties or activities if such characterizations would tend to prejudice the department. The department likewise cannot conclusively rely on such characterizations to its advantage.[0]
[4] In using the word "predecessor" the court does not mean to address whether any preclusive effect exists as a result of the decision inJones Intercable.
[5] As will be discussed below, in 2008 the department adopted OAR 150-308.515(1)(h) to "`clarify' that cable and Internet service providers are `communication' companies subject to central assessment."Oregon Cable Telecommunications v. Dept. of Rev.,237 Or App 628, 630, 240 P3d 1122 (2010). In an opinion dated October 6, 2010, the Court of Appeals struck down this rule due to inadequacies in the rulemaking process followed by the department.Id.
[6] Indeed, the department argued that its interpretation of the statute was not even limited by those expansive words. The department pointed out that the term "communication" in ORS 308.505(2) was stated to "include" telephone and data transmission services. (Def's Post-Trial Br at 42.) The department then concluded that the statute covered other forms of communication and that the department could designate more specifically precisely which ones were subject to central assessment. The discussion of the court will address the statutory and potential constitutional problems with the position of the department even as to the meaning of "data transmission." Suffice it to say that those problems would simply be magnified many times over if the department's additional argument were correct. The better reading of the term "includes," as used in this statutory provision, is that it limits the definition to what follows rather than being a non-exclusive statement.
[7] The terms are so general, categorical and expansive that resort to dictionary definitions provides no practical limitation.
[8] Compare ORS 308.505(3) with ORS 314.280, in which the legislature authorized the department to adopt rules governing use of the "segregated method of reporting" and the "apportionment method of reporting" by taxpayers with "income from business activity as a financial institution or as a public utility * * * which is taxable both within and without this state." Such rules must, however, be in accordance with the policies and standards of ORS 314.280. See FisherBroadcasting, Inc. v. Dept. of Rev.,321 Or 341, 355, 898 P2d 1333 (1995). See also Crystal Communications,Inc. v. Dept. of Rev., ___ OTR ___, (July 19, 2010) (slip op at 9-10).
[9] "No tax or duty shall be imposed without the consent of the people or their representatives in the Legislative Assembly * * *." Or Const, Art I, § 32.
[10] The record includes minutes and notes from meetings of personnel within the department in which they discussed how to go about deciding which communications companies would be subject to central assessment and which would not. The minutes reveal that the department personnel made no reference to any legislative standard or criteria. Instead, acknowledging openly that they were engaged in "policy decisions," they both engaged in discussions and made decisions of the character typically only found in legislative bodies. (See, e.g., Ptf's Ex 36.)
[11] Indeed, as to electricity this is made explicitly clear in ORS 308.515(6).
[12] The court also has great difficulty accepting the department's suggested criteria as one that distinguishes Comcast from other companies engaged in communication and data transmission. One need only read the letters to the editor of the daily newspaper or see or hear the listener comments on television and radio stations to realize that some amount of "two-way" communication cannot explain the department's reasoning or results.
[13] In its post-trial brief the department suggests that the profitability of different services should be used to determine primary use. (Def's Post-Trial Br at 28-29.) The court does not accept that such a position would be a valid interpretation of the statute. A single focus on profitability would, interestingly cause many restaurants to be considered soda fountains as the margin on the sales of soft drinks, in the court's experience, far exceeds the margins of restaurants on food items.
[14] This process is separate from the provisions of ORS 308.515(4), a subsection providing that to the extent a taxpayer is included in the descriptions contained in ORS 308.515 but has other operations, that taxpayer, to the extent it engages in the non-centrally assessed business is not to be treated as a corporation whose properties are centrally assessed. Note that ORS 308.515 addresses the status of the property owner and not the property. That status is, as mentioned above, relevant to issues such as personal liability for taxes due on property.Cf. ORS 311.655. *Page 1