Filed 7/19/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| TIME WARNER CABLE INC. et al.,<br><br>   Plaintiffs and Respondents,<br><br>   v.<br><br>COUNTY OF LOS ANGELES,<br><br>   Defendant and Appellant. | B270062<br><br>(Los Angeles County<br>Super. Ct. No. BC528475) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Marc R. Marmaro, Judge. Affirmed in part and reversed in part with directions.

Mary C. Wickham, County Counsel, Albert Ramseyer, Deputy County Counsel; Glaser Weil Fink Howard Avchen & Shapiro and Elizabeth G. Chilton for Defendant and Appellant.

Gordon & Polland, Paul M. Gordon; Sutherland, Asbill & Brennan, Eversheds Sutherland and Douglas Mo for Plaintiffs and Respondents.

_____

Time Warner Cable (Time Warner) operates a cable system that uses public rights-of-way in Los Angeles to provide cable television,[1] broadband, and telephone services. Time Warner initially only provided television services. Once changing technologies enabled broadband and telephone services to be delivered over cable rights-of-way, Time Warner and many other cable operators began to provide their customers broadband and telephone services over these same rights-of-way.

Time Warner's right to use the public rights-of-way and to conduct business as a television cable operator are conferred via cable television franchise agreements with numerous local franchising authorities. The right to use the public rights-of-way (the possessory interest) is a taxable interest; the right to do business as a cable operator is not. The fee for these franchises is, by federal law, limited to no more than five percent of revenue generated from the provision of television services only.[2] Federal law also prohibits local franchising authorities from granting exclusive franchises.

The issues before us stem from a dispute between the parties as to how the County of Los Angeles (the County) may tax Time Warner's possessory interests. The trial court found that the Assessor of the County of Los Angeles (the Assessor) may tax the possessory interests only on the franchise fee because anyone can obtain an identical franchise for five percent of television

---

[1] For simplicity, we will use the term television to describe that aspect of Time Warner's service, which includes its various video services.

[2] Time Warner pays its franchise fees to the local franchising authorities annually.

revenue. We disagree, as we find no legal restriction on the County valuing the possessory interests in providing all three services. We agree with the trial court that the Assessor's valuation was not supported by substantial evidence. We agree with the trial court that the County erred in taxing the entire five percent of revenue rather than the value of the possessory interests alone. We also agree with the trial court that substantial evidence supported the Los Angeles County Assessment Appeals Board's (the Board) finding that the reasonably anticipated term of possession of Time Warner's rights-of-way was 10 years.

Accordingly, we affirm in part and reverse in part.

## BACKGROUND

On January 1, 2005, Time Warner was party to 13 franchise agreements with public entities in the County. Each franchise included both a right to maintain wires and appurtenances—the distribution plant—on public rights-of-way (the possessory interest) and a right to provide cable services to subscribers. On July 31, 2006, Time Warner purchased the assets of Comcast and Adelphia, which included 77 additional franchises.[3] Each franchise was originally granted for a 10-year term, but as of the assessment years of 2005 to 2008, each had fewer than 10 years remaining. Further, it was undisputed that pursuant to the Digital Infrastructure and Video Competition Act of 2006, Public Utilities Code section 5800 et seq. (DIVCA), the franchising authority for cable television systems would be

---

[3] We will refer to Time Warner's pre-owned and newly-acquired possessory interests as legacy and acquired interests, respectively.

reassigned to the California Public Utilities Commission as of January 2, 2008.

Time Warner's acquisition of Comcast's and Adelphia's assets triggered a Proposition 13 reassessment of the newly-acquired possessory interests to determine their "base year" value, i.e., the value upon which current and future tax assessments would based. At the same time, Time Warner sought to reduce the property tax assessment of its legacy interests, contending they declined below the roll value. Time Warner thus initiated proceedings before the Board to dispute the value of the legacy interests.[4]

Eleven days before the commencement of the Board proceedings, the Assessor sent notice of his intent to augment the values of the possessory interests. Time Warner paid the resulting taxes then instituted refund proceedings before the Board to contest the Assessor's valuation. The Board found against Time Warner on all grounds. Time Warner then filed the instant action in the superior court.

The trial court reversed the Board's decision to uphold the Assessor's valuation of Time Warner's possessory interests based on television, broadband, and telephony revenue. The court reversed the Board's finding that five percent of broadband and telephone revenue represented the fair market value of the possessory interest in providing these services. The court also reversed the Board's determination that the Assessor could tax the full five percent of revenue rather than the portion of economic rent attributable to Time Warner's possessory interests.

---

[4] Time Warner's challenge to the County's valuation of its legacy interests is not a subject of this appeal.

The court upheld the Assessor's use of a 10-year term in valuing Time Warner's acquired possessory interests, finding substantial evidence supported the Board's conclusion that Time Warner's acquired franchises would be renewed.

## DISCUSSION

### A.  Burden of proof

In this case, the Assessor bore the burden of proof on all valuation issues.  Ordinarily, when the taxpayer appeals a property tax assessment, he or she has the burden of proving that the value on the assessment roll is incorrect, or that the property in question has been incorrectly assessed.  (Cal. Code Regs., tit. 18, § 321.)  However where, as in this case, the assessor gives notice that he intends to seek a higher value than the one placed on the assessment roll, the burden shifts to the assessor to prove the higher value.  (Cal. Code Regs., tit. 18, § 313, subd. (f).)

### B.  Standard of review

" 'Where a taxpayer challenges the validity of the valuation method used by an assessor, the trial court must determine as a matter of law "whether the challenged method of valuation is arbitrary, in excess of discretion, or in violation of the standards prescribed by law." [Citation.]  Our review of such a question is de novo.' " (*Charter Communications Properties, LLC v. County of San Luis Obispo* (2011) 198 Cal.App.4th 1089, 1101.) " '[W]here the taxpayer challenges the *application* of a valid valuation method, the trial court must review the record presented to the Board to determine whether the Board's findings are supported by substantial evidence but may not independently weigh the evidence.  [Citations.]  This court . . . reviews a challenge to application of a valuation method under the substantial evidence rule.' " (*Ibid.*, italics added.)

5

We therefore review the Assessor's choice of valuation method de novo, and the resulting valuation itself for substantial evidence.

## C.  General legal principles

Before turning to the issues in dispute between the County and Time Warner, we briefly summarize basic legal principles relevant to cable television franchising and the taxation of possessory interests.

### 1.  *Cable television franchising*

Time Warner provides cable television, broadband, and telephone services through a "[m]ixed-[u]se" cable network. (*In the Matter of Implementation of Section 621(a)(1) of the Cable Communications Policy Act of 1984 As Amended by the Cable Television Consumer Prot. & Competition Act of 1992* (2007) 22 F.C.C. Rcd. 5101, 5155.)  Federal law sets the maximum franchise fee a local franchising authority can collect at five percent of revenue from cable services.  (47 U.S.C. § 542(b).) Under federal law, "cable service" only includes television and related video services, and revenue generated from broadband and telephone services cannot be included in the calculation of "gross revenue" for the purpose of determining the franchise fee. (47 U.S.C. §§ 542(b), 522(6).)  In addition, federal law prohibits local franchising authorities from "unreasonably refus[ing] to award an additional competitive franchise."  (47 U.S.C. § 541(a)(1).)  Thus, franchising authorities are prohibited from granting an exclusive franchise to any prospective cable television operator.

### 2.  *Taxation of possessory interests*

Unless exempt, all property is taxable in proportion to its "full value."  (Cal. Const., art. XIII, § 1; Rev. & Tax. Code, § 201.)

" 'Property' includes all matters and things, real, personal, and mixed, capable of private ownership." (Rev. & Tax. Code, § 103.) Real property includes a possessory interest in land, including a cable company's right-of-way granted by a public entity. (Rev. & Tax. Code, §§ 104, 107; *American Airlines, Inc. v. County of Los Angeles* (1976) 65 Cal.App.3d 325, 328–329; *Cox Cable San Diego, Inc. v. County of San Diego* (1986) 185 Cal.App.3d 368, 378.) However, the right to engage in business as a cable service provider is not an assessable property interest. (*County of Stanislaus v. Assessment Appeals Bd.* (1989) 213 Cal.App.3d 1445, 1452.)

Full value means " 'full cash value' or 'fair market value[,]' . . . the amount of cash or its equivalent that property would bring if exposed for sale in the open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other, and both the buyer and the seller have knowledge of all of the uses and purposes to which the property is adapted and for which it is capable of being used, and of the enforceable restrictions upon those uses and purposes." (Rev. & Tax. Code, § 110, subd. (a).) Property is therefore assessed based on how a hypothetical purchaser in an open and competitive market would value the property, including the normal uses to which the purchaser could put it and the enforceable restrictions upon those uses.

The methods for valuing a possessory interest granted to a cable television operator via franchise "shall include, but not be limited to, the comparable sales method, the income method (including, but not limited to, capitalizing rent), or the cost method." (Rev. & Tax. Code, § 107.7, subd. (a).) Under the income approach, the assessor "values an income property by

7

computing the present worth of a future income stream." (Cal. Code Regs., tit. 18, § 8, subd. (b).) The preferred method of valuing cable television possessory interests is by capitalizing the annual rent, which is "that portion of the franchise fee received that is determined to be payment for the cable possessory interest . . . or the appropriate economic rent." (Rev. & Tax. Code, § 107.7, subd. (b)(2).) "Economic rent" is the estimated amount a prospective buyer would pay on the valuation date for the real property rights provided by the taxable possessory interest. (Cal. Code Regs., tit. 18, § 21, subd. (a)(8).) "If the assessor does not use a portion of the franchise fee as economic rent, the resulting assessments shall not benefit from any presumption of correctness." (Rev. & Tax. Code, § 107.7, subd. (b)(2).) Nothing in the law prohibits the assessor from using alternative valuation methods; the law merely deprives the county of the benefit of a presumption of correctness if it chooses not to value the interest by capitalizing a portion of the franchise fee.

## D. Merits

This case presents four issues. The first issue is whether the Assessor may include revenue from broadband and telephone service in valuing the possessory interests. The second issue is whether substantial evidence supported the Assessor's valuation. The third is whether the Assessor erred by failing to allocate some portion of the economic rent to the intangible assets of Time Warner's cable system. The final issue is whether the Assessor properly assumed a 10-year term of possession with respect to 49 of Time Warner's acquired possessory interests.

8

**1.    *The Assessor may include revenue from broadband and telephone service in valuing the possessory interests***

The trial court ruled that the Assessor may only value Time Warner's possessory interests by capitalizing a portion of the franchise fee.  We disagree.

The Assessor determined that the economic rent of the possessory interests should be based on revenue from all three income streams:  television, broadband, and telephone services.  With respect to television service, the Assessor taxed the franchise fee.  With respect to broadband and telephone services, the Assessor calculated the value of the possessory interests as a percentage of gross revenue from these two income streams.  None of the parties dispute that capitalizing a portion of the franchise fee is the appropriate way to value the possessory interests in providing television service.  The dispute lies in whether the County can also value and tax the possessory interests in providing broadband and cable services.

Time Warner argues that the Assessor erred in valuing the possessory interests based all three income streams:  television, broadband, and telephone.  Time Warner asserts that, because the possessory interests are available in inexhaustible supply to any prospective cable operator at five percent of television revenue, the only way to calculate the fair market value of the possessory interests is by capitalizing a portion of the franchise fee.  The trial court agreed with Time Warner, reasoning that no prospective cable operator would pay more than five percent of television revenue to Time Warner for any possessory interest because the exact same interest could be purchased from the County at that price.

9

The County contends that the trial court overlooked the fact that there is no actual, working market for cable possessory interests. According to the County, prospective cable operators do not go to the franchising authority, obtain a franchise, and then build cable systems from the ground up. Instead, the County argued, prospective cable operators "buy existing systems" because the capital costs are excessive relative to the riskiness of the potential return. The County therefore argues that the value of the possessory interests are not accurately captured by capitalizing the franchise fee; instead, their value is based on the economic rent the possessory interests would command in a rational market.

Time Warner does not argue that prospective cable operators were purchasing new franchises, nor have they provided any evidence demonstrating there was an actual, working market for cable television possessory interests during the assessment period.

The subject possessory interests generate a considerable amount of revenue for Time Warner beyond what they receive from providing television services, and we find no legal restriction on the County assessing property taxes on this added value. Accordingly, we conclude that the added value that Time Warner enjoys by using the possessory interests to provide telephone and broadband services is not beyond the reach of property tax assessment. After all, it is "well settled that 'the absence of an "actual market" for a particular type of property does not mean that it has no value or that it may escape from the constitutional mandate that "all property . . . shall be taxed in proportion to its value" (Art. XIII, § 1) but only that the assessor must then use such pertinent factors as replacement costs and income analyses

10

for determining "valuation." ' " (*De Luz Homes, Inc. v. County of San Diego* (1955) 45 Cal.2d 546, 563.)

Given that there is no evidence of an open and competitive market for Time Warner's possessory interests during the assessment period, we find no error with the Assessor's valuation method.  We therefore reverse the trial court's ruling that the Assessor can only value the possessory interests by capitalizing the franchise fee.

### 2.     *The Assessor's valuation was not supported by substantial evidence*

The trial court found that no substantial evidence supported the Board's finding that five percent of gross revenue from broadband and telephone represented the fair market value of the possessory interests in providing these services.  We agree.

According to the County, the Assessor based its valuation on "the current franchise fee for the use of public rights-of-way to provide cable television service, the fee structure that applied to cable modem revenues prior to March 2002, and the similarity in the manner in which the [s]ubject rights-of-way are used for cable television, telephone, and broadband services."  The Assessor reasoned that since industry pays five percent of television revenue for the possessory interest to provide television service,[5] "it is reasonable to expect that a similar percentage rent would apply" for the use of the possessory interests to provide

---

[5] As discussed below, the Assessor is not necessarily correct that industry pays five percent of television revenue for the possessory interest.  Industry pays five percent of revenue for the franchise, which includes both the possessory interest and the right to do business.  Thus, it is likely that industry pays less than five percent for the possessory interest.

11

broadband and telephone services "were [the possessory interests] exchanged in an open and competitive market."

The only evidence the County provided to support the Assessor's reasoning that the three services should be treated equally is a statement in Time Warner's 2007 annual report submitted to the Security and Exchange Commission indicating that prior to 2002, Time Warner may have paid a franchise fee on revenue from cable modem service.

The mere fact that Time Warner may have paid a franchise fee to provide cable modem services prior to 2002—without more—is not substantial evidence that the fair market value of the possessory interests was five percent of revenue from all three income streams. In addition, neither the Assessor nor the County described the purported similarities in the way possessory interests are used to provide television, broadband, and telephone services. The County merely issues the conclusory statement that the Assessor "considered" the "similarity in . . . manner" in which the possessory interests are used to deliver all three services.

As Time Warner points out, the television, broadband, and television businesses do not operate in similar competitive environments. The more competition a business faces, the lower its value to a prospective purchaser, and the County has failed to make a showing that these three businesses faced levels of competition similar enough to warrant valuing them equally.

Accordingly, we conclude that on this record no substantial evidence supported the Assessor's determination that five percent of gross income from all three income streams represented the fair market value of the possessory interests during the relevant time period. The proceedings must therefore be remanded to the

Board to determine the value of the possessory interests in providing broadband and telephone services, and the taxes thereon.

**3.    *The Assessor erred by failing to allocate some portion of the economic rent to the intangible assets of the cable systems***

Time Warner contends the Assessor erred in determining that the *entire* five percent of revenue constituted the measure of taxable value.  We agree.

Intangible assets and rights are exempt from property taxation, and "the value of intangible assets and rights shall not enhance or be reflected in the value of taxable property."  (Rev. & Tax. Code, § 212, subd. (c).)  As such, in assessing the fair market value of a cable television's possessory interests, "[i]ntangible assets or rights of a cable system or the provider of video services are not subject to ad valorem property taxation."  (Rev. & Tax. Code, § 107.7, subd. (d).)  Intangible assets or rights of a cable system include, but are not limited to:  "franchises or licenses to construct, operate, and maintain a cable system or video service system for a specified franchise term (excepting therefrom that portion of the franchise or license which grants the possessory interest); subscribers, marketing, and programming contracts; nonreal property lease agreements; management and operating systems; a workforce in place; going concern value; deferred, startup, or prematurity costs; covenants not to compete; and goodwill."  (Rev. & Tax. Code, § 107.7, subd. (d).)

"The right to do business has been recognized as an intangible asset exempt from property taxation."  (*Shubat v. Sutter County Assessment Appeals Bd.* (1993) 13 Cal.App.4th 794, 802.)  Accordingly, Time Warner's right to use the public rights-

13

of-way to build and maintain its cable network is subject to property tax; however, its "right to charge a fee and to make a profit from the operation of the business is a constitutionally protected nontaxable asset." (*County of Stanislaus v. Assessment Appeals Bd.*, *supra*, 213 Cal.App.3d at p. 1449.)

Although a cable television operator's right to do business is exempt from ad valorem property taxation, the right to use and maintain the public rights-of-way to operate the network "may be assessed and valued by assuming the presence of intangible assets or rights necessary to put the . . . possessory interest to beneficial or productive use in an operating cable [television] system." (Rev. & Tax. Code, § 107.7, subd. (d).) Thus, while the right to do business cannot be directly taxed, the assessor may, in valuing the right to use the public-rights-of-way, "take into consideration the presence of the intangible assets necessary to put the possessory interest to beneficial or productive use in the operation of the cable television system." (*County of Stanislaus v. Assessment Appeals Bd.*, *supra*, 213 Cal.App.3d at p. 1449.)

With respect to television services, the Assessor testified that he did not apportion the franchise fee between the tangible and intangible rights. In his testimony before the Board, the Assessor initially disagreed that Revenue and Taxation Code section 107.7, subdivision (d) precluded him from taxing Time Warner's intangible assets. However, he shortly thereafter agreed that "business intangibles are not to be assessed." In any event, the Assessor taxed the "full portion" of the franchise fee rather than allocating a portion to the intangible right to do business.

With respect to the provision of broadband and telephone services, there is no evidence in the record that the Assessor

14

distinguished between the intangible and tangible assets when calculating the economic rent of the possessory interests for these purposes.  Nor have the parties offered argument on the issue.

We therefore conclude that the Assessor erred by failing to allocate some portion of the economic rent to the intangible assets of Time Warner's cable system before taxing the possessory interests.

**4.** ***Substantial evidence supported the Assessor's use of a 10-year term of possession***

Time Warner contends the trial court erred in affirming the Assessor's valuation of its acquired franchises as if they had 10 years to run, where it was undisputed that they all had fewer than 10 years remaining, and in any event would soon be supplanted by DIVCA.  We disagree.

To arrive at the fair market value of a possessory interest, an assessor must determine the actual or reasonably anticipated term of possession.  (See Rev. & Tax. Code, § 107.7, subd. (b)(1) [pertaining to valuation of cable television franchises].)  " 'The term of possession is a significant variable in possessory interest valuation, and the assessor reviews it on each lien, or valuation, date.' . . .  '[T]he greater [the] number of years in a term of possession, the greater the present value; fewer years result[ ] in a lower present value.' " (*Charter Communications Properties, LLC v. County of San Luis Obispo*, *supra*, 198 Cal.App.4th at pp. 1099–1100.)

Section 21 of title 18 of the California Code of Regulations sets forth Property Tax Rule 21, which provides that "[t]he term of possession for valuation purposes shall be the reasonably anticipated term of possession." (Cal. Code Regs., tit. 18, § 21, subd. (d)(1).)   The reasonably anticipated term of possession of

15

an asset may be different from the agreed term if clear and convincing evidence demonstrates "that the public owner and the private possessor have reached a mutual understanding or agreement, whether or not in writing," that the actual term would be longer or shorter than the agreed term. (Cal. Code Regs., tit. 18, § 21, subd. (d)(1).) The parties are deemed to incorporate the effect of applicable law as part of their understanding.

Here, the remaining term of possession for 49 of Time Warner's acquired franchises was less than 10 years. (The other acquired franchises had already expired by the time Time Warner acquired them.) The average remaining term was five years, and many of the franchises had fewer than 10 months remaining.

Substantial evidence supported the Board's finding that the parties understood the reasonably anticipated term of Time Warner's possessory interests was 10 years. First, Time Warner acknowledged that when it took possession of its acquired franchises they had no telephone operations, which it subsequently initiated on those parcels "from scratch." A reasonable investor would not undertake such a significant investment unless it intended to extend its franchise beyond the stated term. Second, Fern Taylor, the County's chief of policy and planning for telecommunications, testified that since 1980, no cable franchise has been terminated for cause or denied renewal. And, federal law sharply restricts the grounds upon which a franchisor may deny renewal of the franchise. For example, section 546 of title 47 of the United States Code provides that renewal may be denied only if the franchisee breaches the franchise agreement or applicable law, fails to

provide reasonable services, or is unable to continue providing service. (47 U.S.C. 546(d).)

These circumstances constitute substantial evidence that Time Warner and the franchisors understood that the acquired franchises would last as long as Time Warner wanted them to. As the trial court found, "[t]o reduce the terms' length for valuation purposes would be to completely ignore the near certainty that the franchise[s would] be renewed."

Time Warner does not dispute this reasoning. It acknowledges that all parties understood that even after DIVCA it would continue to operate its business under the new, state franchise issued under the aegis of DIVCA. However, Time Warner argues, a state franchise under DIVCA would involve different parties and different agreements conveying different possessory interests. Therefore, it argues, Property Tax Rule 21 cannot apply because it would be impossible for any current public owner to reach an unstated understanding as to the reasonably anticipated term of possession under a current agreement. The argument is without merit.

" 'Possession' of real property means . . . actual physical occupation of the property pursuant to rights not granted to the general public." (Cal. Code Regs., tit. 18, § 20, subd. (c)(2).) "[P]ossession for valuation purposes" means "the reasonably anticipated term of possession." (Cal. Code Regs., tit. 18, § 21, subd. (d)(1).) Time Warner acknowledges that all parties implicitly understood that it would physically occupy its rights-of-way for as long as it chose to do so, notwithstanding the anticipated change from local to state control.

It is undisputed that, by law, the Public Utilities Commission will charge Time Warner the same fee for the same

17

rights over the same length of time as any local authority. (Pub. Util. Code, §§ 5840, subd. (q), 5850, subd. (a).) No rational seller in an open market would accept a lesser sum than this fee in exchange for its cable service rights-of-way just because after DIVCA, those interests would be administered by the commission rather than a local authority.

## DISPOSITION

We reverse the trial court's order directing the Board to value the possessory interests based only on five percent of cable television revenue. In all other respects, the judgment is affirmed.

The matter is remanded to the trial court with directions to remand the matter to the Board. Consistent with this opinion, the Board shall determine the value of the possessory interests in providing broadband and telephone services, and shall allocate some portion of the economic rent to the intangible rights and assets of Time Warner's cable system.

The parties are to bear their own costs on appeal.

CERTIFIED FOR PUBLICATION.


JOHNSON, J.


I concur:


ROTHSCHILD, P. J.

18

CHANEY, J., concurring and dissenting.

I join in all of the majority opinion except Part D(1) of the Discussion portion, from which I respectfully dissent.

The Constitution directs that all real property be assessed as a percentage of "fair market value." (Cal. Const., art. XIII, § 1.) For tax purposes, "property" includes a right-of-way granted to a cable service provider by a public entity (*Cox Cable San Diego, Inc. v. County of San Diego* (1986) 185 Cal.App.3d 368, 378) but not the right to provide the cable service itself (*Shubat v. Sutter County Assessment Appeals Bd.* (1993) 13 Cal.App.4th 794, 801; see Rev. & Tax. Code, § 107.7, subd. (d)).

"Fair market value" means the value a willing buyer would pay to a willing seller in an open market. (Rev. & Tax. Code, § 110, subd. (a) [" 'fair market value' means the amount of cash or its equivalent that property would bring if exposed for sale in the open market"]; *Kaiser Co. v. Reid* (1947) 30 Cal.2d 610, 623.) Property is therefore assessed based on the value that a hypothetical buyer would pay for it in the marketplace, "not the taxpayer's peculiar benefits . . . unrelated to the market." (*Mola Dev. Corp. v. Orange County Assessment Appeals Bd.* (2000) 80 Cal.App.4th 309, 325-326.)

A right-of-way granted to a cable service provider by a public entity gives the provider "the right to place wires, conduits, and appurtenances along or across public streets, rights-of-way, or public easements." (Rev. & Tax. Code, § 107.7, subd. (a).) For tax purposes, the fair market value of this right may be determined by a variety of methods, including but not limited to "the comparable sales method, the income method (including, but not limited to, capitalizing rent), or the cost method." (*Ibid*.) The preferred method is to capitalize the

annual rent, which is an "income method." (Rev. & Tax. Code, § 107.7, subd. (b)(1).)

Here, each franchise agreement at issue granted Time Warner Cable a single real property interest—the right to maintain wires and appurtenances on the granting entity's property for the purpose of providing cable services to subscribers.[1] The highest price any franchisor charged for the

[1] For example, in 2003 the County of Los Angeles by way of Ordinance No. 2003-0078F granted Time Warner the right to "construct, reconstruct, maintain, and to operate a Cable Television System . . . in the unincorporated Service Areas of [North Torrance] and to construct, reconstruct, maintain, operate, renew, repair, and remove in th[o]se service areas radio and television signal transmission lines and cables and all appurtenances and/or service connections . . . which are necessary or convenient for the provision of [such] a System."

A "cable television system" within the meaning of the grant "means a system of antennas, cables, wires, lines, towers, waveguides, microwaves, microwave, laser beam, fiber optics, master antenna system, multiple distribution system, satellite, or any other conductors, converters, equipment or facilities designed and constructed for the purpose of producing, receiving, amplifying and distributing audio, video, voice, data signals, digital signals, fiber optic signals, and other forms of electronic or electrical signals, located in the unincorporated area of the county of Los Angeles, and constructed or used for one or more of the following purposes: [1] Collecting and amplifying local and distant broadcast television or radio signals and distributing and transmitting them; [2] Transmitting original cablecast programming not received through television broadcast signals; [3] Transmitting television pictures, film and videotape programs not received through broadcast television signals, whether or not encoded or processed to permit reception by only selected receivers; [4] Transmitting and receiving all other signals: digital,

2

interest was five percent of what Time Warner received for providing television service only, not broadband or telephone service. Several franchisors charged less than this amount but none charged more, and nothing in the record suggests any franchisor desired to charge more.[2] The fair market value of each interest, the value a hypothetical buyer would pay for it in the marketplace, was therefore 5 percent of television revenues, at most. No buyer would pay more because if anyone attempted to sell one for more the buyer would simply apply to the franchisor for a new one, and receive it. (See 47 U.S.C. § 541(a)(1) ["a franchising authority may not grant an exclusive franchise"].)

The County of Los Angeles argues, and the majority agrees, that a franchise fee based only on television revenue does not capture the "full value" of a possessory interest which also

---

voice and audio-visual; [and 5] Any other applications used in transmitting audio and/or visual signals." (Los Angeles County Ord. No. 16.58.060, subd. (A).)

[2] The franchisors may have felt constrained by federal law from charging more. (See 47 U.S.C. § 542(b) ["For any twelve-month period, the franchise fees paid by a cable operator with respect to any cable system shall not exceed 5 percent of such cable operator's gross revenues derived in such period from the operation of the cable system to provide cable services"]; see also *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.* (2005) 545 U.S. 967, 974 [125 S.Ct. 2688, 2695, 162 L.Ed.2d 820, 833] ["cable service" within the meaning of mandatory common-carrier regulation does not include broadband]; Pub. Util. Code, §§ 5840, subd. (q)(1) [franchise fee payable as rent to use the public rights-of-way "shall be 5 percent of gross revenues"], 5860, subd. (e)(3) ["gross revenue" excludes revenue from broadband and telephony].)

generates broadband and telephony revenue.  I do not disagree. But the Constitution permits assessment only of the "fair market value" of a property interest, which here has an upper limit of 5 percent of television revenue.  The additional value resulting from broadband and telephony services is a peculiar benefit unrelated to the relevant market, and is not taxable.

I would affirm the trial court's judgment in its entirety.


CHANEY, J.